187 Cal.App.4th 1380 (2010)
In re A.M. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent,
v.
D.M., Defendant and Appellant.
No. D056196.
Court of Appeals of California, Fourth District, Division One.
August 11, 2010.
*1382 Cristina Lechman, under appointment by the Court of Appeal, for Defendant and Appellant.
John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.
Robert Wayne Gehring, under appointment by the Court of Appeal, for Minors.

OPINION
BENKE, Acting P. J.
D.M. appeals orders declaring his minor children, A.M., Anastasia M., Gage M. and Gavin M. (together, the minors), dependents of the juvenile court under Welfare and Institutions Code[1] section 300, subdivision (f). D.M. challenges the sufficiency of the evidence to support the court's jurisdictional findings. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND
D.M. and Tiffany were the parents of James. In June 2004 newborn James died. D.M. and Tiffany were referred to the San Diego County Health and Human Services Agency (the Agency) after James's death. The parents agreed to participate in services to address their grief. Services included therapy for the parents, psychological evaluations and childcare services. The Agency also recommended that A.M. receive therapy to address James's death.
*1383 One year later, the Agency reported the parents had made some progress. They attended therapy and submitted to psychological evaluations. They did not make arrangements, however, for A.M. to participate in therapy. D.M.'s psychological evaluation report stated that he suffered physical and sexual abuse as a child. The evaluator concluded D.M. was not sufficiently resourceful to cope with life's demands and that D.M. relied on "primitive defenses of denial and avoidance to handle his emotions." The evaluator recommended intensive therapy for D.M. to address issues such as anger, guilt and depression.
In March 2009 the Agency received two referrals concerning the family. Reports surfaced that Tiffany was suffering from depression and had attempted suicide at least five times. Her latest suicide attempt involved overdosing on pain medication and herbal remedies. D.M. took Tiffany to the hospital the day after she ingested the medications. Tiffany claims she wanted to tell doctors at the emergency room that she had attempted suicide but instead, D.M. reported that Tiffany accidentally overdosed. Tiffany believed D.M. did not want to reveal the truth because he was in the military and was concerned her actions might negatively impact his career.
The next day, Tiffany took Anastasia to the emergency room after Anastasia displayed symptoms of anxiety. Tiffany told the doctors that Anastasia was anxious because of Tiffany's recent suicide attempt.
The Agency and the Naval Criminal Investigative Service (NCIS) reported that Tiffany struggled to provide basic care for her children. Tiffany claimed the minors were bipolar and they were not receiving medication because their prescription medication had run out. D.M. did not believe the minors suffered from bipolar disorder. Tiffany reported to an NCIS agent that she was suicidal and would kill herself by taking pills or causing her car to crash. Tiffany reported she was depressed and the reasons for her depression included James's death and that D.M. physically and sexually abused her. She also reported that D.M. physically abused the minors.
The Agency filed a section 300, subdivision (b), petition on behalf of the minors. The petition alleged that the mother's suicide ideation and suicide attempt placed the minors at risk of harm. The petition further alleged D.M. had failed to protect the minors. The court detained the minors in out-of-home care. D.M. was prohibited from having contact with the minors by a military protective order.
The Agency began an investigation concerning the allegations of abuse in the home. Tiffany told social workers that D.M. had punched and pushed her about a week before her last suicide attempt. She admitted she also *1384 pushed D.M. D.M. initially denied having physical altercations with Tiffany but later admitted he once pushed Tiffany. D.M. denied abusing the minors and stated that at most he would hit the minors once on their bottoms while they wore clothes or diapers.
Tiffany claimed the abuse against the minors was severe and reported D.M. had hit A.M. with a two-by-four block of wood and that about a year earlier, he had choked Anastasia. She further claimed D.M. hit the minors hard enough to leave bruises and that on one occasion D.M. placed a pillow over A.M.'s face to keep her quiet.
The social worker met and interviewed the minors with the purpose of investigating the allegations of physical abuse. The minors denied that D.M. had abused them but the social worker assessed the minors' answers as rehearsed. The social worker referred the minors to a forensic interview.
A.M. revealed that D.M. would hit her and her siblings when they were bad. She claimed that it would hurt when he hit them, and they were afraid of their father. He would hit them on their bottoms as well as on other parts of their bodies. A.M. stated that her parents would often fight about D.M. hitting her and her siblings.
Anastasia reported D.M. hit her and her siblings and would leave hand marks on them. She stated she was afraid of D.M. because he hit too hard. During the interview Anastasia stated there were things she was not supposed to tell but later denied that anyone told her not to tell the truth. Gage also participated in a forensic interview. He also reported being afraid of D.M. because D.M. would hit and hurt him.
In May 2009 the Agency recommended that the court order the removal of the minors from parental custody and that the parents participate in services. The parents submitted on the section 300, subdivision (b), petitions but objected to the Agency's dispositional recommendations. The court set a contested disposition hearing.

NCIS 2009 Investigation
In the interim, the NCIS reopened its investigation into James's death following allegations by Tiffany that D.M. had punched, kicked and smothered the minors with a pillow in an effort to keep them quiet or when he was frustrated.
D.M. participated in a two-day investigation conducted by the NCIS. An NCIS agent reported to the Agency that during the investigation, D.M. *1385 admitted to causing James's death. On the night of James's death, D.M. claims he came into the bedroom and saw Tiffany, Gage and James asleep in the bed. D.M. stated he moved James a few inches away from Tiffany. He also moved Gage away from the baby and put a pillow between Gage and James. D.M. attempted to sleep on the floor but had trouble falling asleep.
D.M. at one point left the room to take out the trash. He returned to the bedroom to find Gage on top of the pillow. D.M. got into bed and moved Gage toward him. D.M. then fell asleep.
He later awoke to the sounds of James crying. After a few minutes, James continued to cry. D.M. decided to push James toward Tiffany in an effort to wake her up. He pushed James as far as he could and could feel James turning onto his left side. He left James in that position and then heard James making sounds like he was struggling to breathe. D.M. stated it did not sound like James was breathing normally, and D.M. admitted knowing that James would not be able to breathe in that position. He listened to James struggle to breathe for about two minutes. D.M. then went to sleep.
D.M. later awoke when Tiffany yelled at him for sleeping in the bed. He fell back asleep and shortly after that, the minors' grandmother woke him up to tell him James was not breathing. D.M. went into the dining room and saw James on the dining room table. James had blood coming out of his nose and the left side of his mouth. D.M. attempted to resuscitate James until the authorities arrived and took over the situation.
D.M. reported he did not intend to kill James. He did not believe that Gage or Tiffany had rolled onto James. D.M. stated that he knew a six-day-old newborn should not be left on his or her stomach because this position could restrict the newborn from breathing. He stated that he knew James was having trouble breathing but he did not do anything to correct the situation. He claimed he did not intend to kill James but that he was aware of the dangers of letting a newborn sleep on his stomach. D.M. did not intervene to place James on his back because, he claimed, he was too tired.
The NCIS provided a copy of its report and D.M.'s statements to the medical examiner. Stephen C. Chapman, M.D., issued an amended autopsy report. The initial 2004 autopsy report listed the manner of James's death as "accidental." The amended report changed the manner of death to "undetermined." Dr. Chapman made the change to the manner of death based on the new information in the NCIS report and the allegations of abuse against the minors, including allegations by Tiffany that D.M. had suffocated other children in the home.
*1386 The Agency filed section 342 supplemental petitions on behalf of the minors under section 300, subdivision (f), alleging D.M. caused James's death.

Jurisdiction and Disposition Hearing
In September 2009 the court held a jurisdiction and disposition hearing. The court granted the Agency's request to bifurcate the two phases of the trial. The court received in evidence the Agency's reports and heard testimony from witnesses including Dr. Chapman and social worker John Juarez.
Dr. Chapman testified he conducted James's autopsy in June 2004. He determined that the cause of death was asphyxiation due to compression/overlay and that the manner of the death was accidental. Dr. Chapman explained that "compression" referred to pressure and "overlay" is the term used for someone being on top of a baby in bed.
In 2009 Dr. Chapman received the NCIS report that included D.M.'s recent statements admitting responsibility for James's death. Dr. Chapman reviewed the report and consulted with other physicians in his office. He changed the manner of death from "accidental" to "undetermined." Dr. Chapman went on to explain that the new information in the NCIS report made it possible that the manner of death was something other than an accident. He also stated that it became clearer to him after reading the latest report that James died because he could not breathe.
Dr. Chapman testified there is a statistical relationship between babies lying face down on their stomach and babies dying. However, simply having a baby facedown is not "generally sufficient" to cause death. Dr. Chapman could not conclude that leaving James on his stomach for two minutes was reasonably likely to have caused James's death. Dr. Chapman also could not reasonably conclude that James's death was a homicide.
Dr. Chapman further testified he was not able to form an opinion as to whether there was negligence in the instant case. It is his understanding, however, that designating the manner of death as "undetermined" is sufficiently elastic to include instances of negligence.
Juarez testified that in his opinion, D.M. caused James's death through abuse or neglect. Juarez based his opinion on the statements made by D.M. to the NCIS agents, the amended autopsy reports and the statements made by the minors during their forensic interviews.
The court issued its findings at the conclusion of the hearing. The court acknowledged it had reviewed D.M.'s statements. The court also acknowledged the manner of James's death was undetermined and that the type of *1387 compression placed on James was unknown. The court pointed out that at one point during the night of James's death, D.M. admitted to hearing James cry and that D.M. then moved James over to the back of Tiffany. D.M. did not wake Tiffany. The court reasoned that D.M. placed James at risk by placing the newborn on his stomach and moving him so close to Tiffany, thereby creating the potential that someone could roll over on to James. The court noted D.M. knew of the risks because he had earlier moved Gage away from James and placed a pillow as a barrier between Gage and James.
The court also noted that D.M. heard James's labored breathing. D.M. described the sounds that James made as suffocating. He listened to the breathing for about two minutes but did nothing to intervene. The court concluded that when a parent recognizes a risk, has the ability to assess the risk and is in the position to intervene but does not intervene, the parent does contribute to the cause of death.
The court found the petitions filed under section 300, subdivision (f), to be true by clear and convincing evidence. In stating its finding, the court referenced the amendment made to section 300, subdivision (f), removing the requirement that a parent be convicted of causing the death of a minor and that the new standard was the statute applied when the parent causes the death of a child by neglect or misfeasance.
D.M. timely filed a notice of appeal.

DISCUSSION

D.M.'S CHALLENGE TO THE COURT'S JURISDICTIONAL FINDINGS
D.M. challenges the sufficiency of the evidence to support the court's jurisdictional findings under section 300, subdivision (f). D.M. asserts the court should have discounted his admission that he caused James's death because he made his admission years after James died and was coerced into making the statements. He further asserts there is no medical evidence to support the court's findings. Thus, his statements are unreliable.

A. Substantial Evidence Supports the Court's Section 300, Subdivision (f), Jurisdictional Finding

(1) Section 300 jurisdiction hearings require a preponderance of the evidence as the standard of proof. (§ 355, subd. (a).) In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court. We do not *1388 pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Instead, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. (In re Casey D. (1999) 70 Cal.App.4th 38, 52-53 [82 Cal.Rptr.2d 426]; In re Baby Boy L. (1994) 24 Cal.App.4th 596, 610 [29 Cal.Rptr.2d 654].) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the order. (In re L. Y. L. (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688]; In re Geoffrey G. (1979) 98 Cal.App.3d 412, 420 [159 Cal.Rptr. 460].)
(2) A child comes within the jurisdiction of the juvenile court under section 300, subdivision (f), when the court finds "[t]he child's parent or guardian caused the death of another child through abuse or neglect."[2] Section 300, subdivision (f), requires a causal connection between the parent's acts or omissions and a child's death. A cause is defined as "[s]omething that produces an effect or result." (Black's Law Dict. (9th ed. 2009) p. 250, col. 1.) Under both criminal and civil standards, a causal connection occurs when the acts of an individual are a substantial factor contributing to a death or injury. (See People v. Caldwell (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274]; see also Rutherford v. Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 968-969 [67 Cal.Rptr.2d 16, 941 P.2d 1203].)
(3) Here, there is sufficient evidence to support the court's findings. The court relied on the statements D.M. made to the NCIS agents in supporting its findings. D.M. stated that when he was in the family bed, he "pushed" James as far as he could toward Tiffany in hopes that she would wake up and attend to James's crying. D.M. later admitted he heard James struggling to breathe and that James was not breathing normally. He listened to James struggle for about two minutes. D.M. stated he did not take any action and instead, he went to sleep. As Dr. Chapman concluded in the amended autopsy report, James died of asphyxiation with compression/overlay. While Dr. Chapman did not find the manner of death to be homicide, he also did not find the manner of death to be accidental. As the trial court stated, D.M. recognized there was a risk to James and he had the ability to "qualify, quantify and assess the risk, and, more importantly, [was] in a position and [had] the means to intervene." D.M., however, did not intervene even though he heard James struggling to breathe. The evidence is sufficient to support the juvenile court's finding that D.M. caused the death of James through neglect.
*1389 D.M. further argues there was no evidence showing that he posed a risk to the minors and thus, the court erred by sustaining the section 300, subdivision (f), petitions.
(4) When "the statutory language is unambiguous, `we presume the Legislature meant what it said, and the plain meaning of the statute governs.' [Citation.]" (Whaley v. Sony Computer Entertainment America, Inc. (2004) 121 Cal.App.4th 479, 485 [17 Cal.Rptr.3d 88].) (5) Section 300, subdivision (f), makes no mention and does not require that a minor be at risk of harm for the court to take jurisdiction over the minor. The statute states that the court has jurisdiction over a minor if the court finds by a preponderance of the evidence that "[t]he child's parent or guardian caused the death of another child through abuse or neglect." (§ 300, subd. (f).) The language of section 300, subdivision (f), does not require a finding of current risk.
(6) The language of the statute is in contrast to the remaining subdivisions to section 300. In looking at the language of the remaining subdivisions, including subdivisions (a), (b), (c), (d) and (j), we see that these subdivisions specifically provide provisions allowing a court to take jurisdiction over a minor when a minor is at risk of harm. (§ 300.) "`Where a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted.'" (In re Connie M. (1986) 176 Cal.App.3d 1225, 1240 [222 Cal.Rptr. 673].) Thus, we conclude the court did not need to make findings that D.M. posed a risk to the minors under the language of the statute. The only issue before this court is whether substantial evidence supports the court's true finding on the section 300, subdivision (f), petitions. As noted ante, there is sufficient evidence to support the court's jurisdictional findings under this subdivision.

B. Credibility Challenges

In addition to challenges to the sufficiency of the evidence, D.M. raises several other arguments relating to the credibility of the statements he made to the NCIS and the credibility of Tiffany's statements to the social worker.
D.M. first argues the court should have deemed his admissions unreliable because the statements came years after James's death and he was coerced into making the statements during his interview with the NCIS. He also argues that Tiffany's assertions that he abused the minors were not reliable. Finally, he asserts that the NCIS coerced statements from him during his interview and that the statements could not be properly relied upon by the trial court.
*1390 D.M.'s arguments, however, ignore the most fundamental precept of the relationship between the trial and appellate courts: the trier of fact resolves issues of credibility. (In re Diamond H. (2000) 82 Cal.App.4th 1127, 1135 [98 Cal.Rptr.2d 715], disapproved on another ground in Renee J. v. Superior Court (2001) 26 Cal.4th 735, 749, fn. 6 [110 Cal.Rptr.2d 828, 28 P.3d 876]; In re Autumn H. (1994) 27 Cal.App.4th 567, 576 [32 Cal.Rptr.2d 535].) Issues of fact and credibility are matters for the trial court alone. (In re Amy M. (1991) 232 Cal.App.3d 849, 859-860 [283 Cal.Rptr. 788]; In re Nada R. (2001) 89 Cal.App.4th 1166, 1177 [108 Cal.Rptr.2d 493].) We must affirm an order even if other evidence supports a contrary finding. (In re Casey D., supra, 70 Cal.App.4th at pp. 52-53.)
At the conclusion of the jurisdiction hearing, the court made specific findings concerning the credibility of D.M.'s statements. The court acknowledged that the statements came several years after James's death. The court observed the statements were made with great detail and attention to chronology. The court ultimately found that the accuracy of D.M.'s recall of events was consistent with D.M.'s feelings of guilt. After considering all of the evidence and having the opportunity to observe the demeanor of witnesses, the juvenile court was in the best position to make the credibility findings concerning D.M.'s statements.
Further, nothing in the record shows that D.M.'s statements to the NCIS had been coerced. Rather, the record shows D.M. initialed and signed the transcript of his NCIS interview, verifying its accuracy. He stated that he had been treated fairly during the interview and that he described his NCIS examiner as "not biased towards me."
The same reasoning applies to D.M.'s second argumentthat statements made by Tiffany lacked credibility. Specifically, D.M. asserts statements made by Tiffany that he abused the minors were not reliable because Tiffany suffered from mental health problems. Again, credibility determinations are matters for the trial court. (In re Nada R., supra, 89 Cal.App.4th at p. 1177.) In any event, as argued by the Agency, the trial court did not reference statements made by Tiffany in making its jurisdictional findings. Rather, the court relied on D.M.'s detailed account of the night of James's death and the statements he made to the NCIS during his interview. Based on the record, and that determinations of credibility are questions for the trial court, we decline to reweigh the evidence. (In re Amy M., supra, 232 Cal.App.3d at pp. 859-860.)

*1391 DISPOSITION
The orders are affirmed.
Nares, J., and McIntyre, J., concurred.
NOTES
[1] All statutory references are to the Welfare and Institutions Code.
[2] Prior to January 1, 1997, dependency jurisdiction under section 300, former subdivision (f), was authorized when the juvenile court found that the child's parent or guardian "has been convicted of causing the death of another child through abuse or neglect." (Stats. 1987, ch. 1485, § 4, p. 5605.)