188 Cal.App.4th 992 (2010)
115 Cal. Rptr. 3d 847
In re ETHAN C. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Appellant,
v.
WILLIAM C., Defendant and Appellant.
No. B219894.
Court of Appeals of California, Second District, Division One.
September 24, 2010.
*994 Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Judith A. Luby, Principal Deputy County Counsel, for Plaintiff and Appellant.
Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

OPINION
JOHNSON, J.
A father drove his toddler daughter after failing to secure the child in a car seat. The father became involved in a traffic accident, and the child was thrown from the car and died. The father's other two children were detained by the Los Angeles County Department of Children and Family Services (DCFS). The father contends dependency court jurisdiction was improperly asserted because, although he negligently failed to secure his daughter in a car seat, his undisputed negligence did not rise to the level of criminal negligence he claims is required by Welfare and Institutions Code section 300, subdivision (f).[1] We affirm.
DCFS filed a cross-appeal, arguing the juvenile court erred by dismissing allegations under section 300, subdivision (b), which refer to the father's neglect of his daughter which resulted in her death. These allegations are a necessary predicate to sustain identical allegations under section 300, subdivision (j), which the juvenile court sustained. We agree the juvenile court erred in this respect; the dismissed allegations must be reinstated and sustained.

FACTUAL AND PROCEDURAL BACKGROUND
Appellant William C. and his wife Kimberly G. (who is not a party to this appeal) are the parents of three children, Ethan C. (born Jan. 2006), Jesus C. (born Nov. 2008), and the now deceased Valerie C. (born Nov. 2007). On June 17, 2009, 18-month-old Valerie died in an automobile accident. The circumstances surrounding that accident led up to the filing of the section 300 petition in this action by DCFS.
In March or April,[2] William and Kimberly separated. The children lived with William and numerous members of his extended family in their paternal grandmother's home, which was described as very crowded and unkempt.
*995 On June 17, William left Valerie in the care of her paternal grandmother and a paternal aunt. When he returned, he noticed Valerie's arm was injured,[3] and he decided to take her to the hospital to have the arm checked out. His car, which had a child's car seat, was being used by someone else. William was unable to get another car seat from Kimberly so he drove his daughter to the hospital unsecured by any child safety restraint. Valerie traveled in the car sitting on the lap of her aunt or paternal grandmother. As William, who had the right-of-way, drove into an intersection, another car traveling at a high rate of speed ran through a stop sign and struck William's car, causing it to spin into another car. William's car was then struck by a fourth vehicle. As a result of the collisions, Valerie was thrown from the car and landed on her head. The coroner concluded the cause of Valerie's death was accidental, and due to blunt force injury. An early DCFS report indicated that criminal charges would likely be filed against William and the driver who ran through the stop sign; no criminal charges have been filed against William.
About a week after Valerie's death, DCFS received a referral claiming Ethan and Jesus were the victims of general neglect by their parents. The children's hygiene was reportedly quite poor, and their paternal grandmother's home was allegedly filthy, with food, feces and trash strewn everywhere. Although a DCFS investigation revealed the conditions at the paternal grandmother's home were not as severe as reported, the home was unsanitary, none of the utilities were working properly, the children lacked cribs or appropriate sleeping arrangements, and there appeared to be an excessive number of people (20 or more) living in the home. Ethan and Jesus were dirty and they ran around the yard with no one paying any noticeable concern for their safety.
Kimberly told DCFS she was not sure William had ever had any car seats. Kimberly seemed detached from her emotions, and had difficulty understanding and responding to questions. Kimberly's mother (the children's maternal grandmother) told DCFS Kimberly had cognitive impairments: she was 20 years old at the time, but had the mental capacity of an 11 year old. The maternal grandmother said Kimberly's impairments became more noticeable after she, William and their children began living with William's relatives, who treated Kimberly poorly and were sometimes physically abusive to her. Shortly before Valerie's death, the maternal grandmother had taken Jesus to live with her because she worried that he had been neglected, isolated and that his medical needs were going unmet. After Valerie died, the maternal grandmother brought Ethan to her home too. She believed all the children had been seriously neglected by William's family, and that Ethan would be in *996 danger if he stayed with his paternal relatives. When the maternal grandmother took Ethan to her home, his diaper contained a bowel movement so firmly stuck to his buttocks the child had to be bathed in order to soften and remove the feces. Ethan, who was then three years old, did not know how to use utensils to feed himself (he ate using his hands), was confused about the difference between day and night, and lacked language skills. He also displayed what appeared to be signs of developmental delays, and had several rotten teeth that required extraction.
Additional investigation revealed the children's parents had engaged in acts of domestic violence in the home. Kimberly was the primary aggressor. On various occasions, Kimberly had hit William with objects and had cursed at, slapped, socked and threatened him. William attributed Kimberly's behavior to emotional instability and his wife's extreme jealousy. He told DCFS that three times the behavior had escalated to a point that Kimberly wanted to harm herself. William took her in for mental health services, but Kimberly had not consistently complied with her treatment plans. Kimberly admitted she got angry at and sometimes hit or threw objects at William, but she said she did "`not physically abuse him, just like a punch.'" She did not believe her punches were abusive, or that William had not been physically hurt, because she "`did not give him a black eye or nothing.'" Kimberly conceded she had difficulty controlling her anger, but said she had never hit her children and never would. There was evidence Kimberly had been diagnosed with borderline personality disorder, had a history of suicide attempts and generally functioned at a level no greater than a 13 year old. A psychologist expressed serious reservations about her ability to care for young children.
DCFS and the parents agreed the family would participate in a voluntary reunification plan. Nevertheless, DCFS decided the children should be detained due to, among other things, safety concerns about inappropriate adult supervision that had resulted in Valerie's initial arm injury, the apparent lack of children's cribs or car seats, and the unacceptable conditions at the paternal grandmother's house. The boys were placed in foster care, and the parents were given monitored weekly visitation, and agreed to participate in psychological assessments.
Beginning in late June, William and Kimberly began participating in parenting classes, and William started grief counseling. But William still had not moved out of the paternal grandmother's home into a clean, safe, less populated residence into which DCFS could safely restore the children to his care. In addition, the criminal investigation surrounding Valerie's death remained open. In mid-August, the LAPD (The Los Angeles Police Department) informed DCFS it planned to ask the district attorney to charge William with child neglect and endangerment, but was waiting for more *997 information before it did so. A psychological evaluator told DCFS William continued to experience difficulty dealing with his grief over the death of his daughter, and as a result had some negative and violent interactions with Kimberly. William was also taking painkillers for back pain he suffered as the result of another traffic accident in which he had been involved in 2008.
DCFS determined it was not feasible to consider whether the children could safely be returned to William's care within the time parameters provided by the voluntary family reunification program. Other limitations inhibited DCFS's ability to consider returning the children to Kimberly. Her limited cognitive abilities and acknowledged need for assistance to help her properly care for and supervise her children presented a serious impediment. It was clear the parents loved their children. Nevertheless, DCFS had continued and significant concerns that the children would remain at physical and emotional risk in either parent's care. DCFS opined that the issues could be "worked through," and the "family would greatly benefit from supportive services." Accordingly, it recommended the juvenile court detain and assert its jurisdiction over the children.
A section 300 petition was filed on August 18. As ultimately sustained, the petition alleged that Ethan and Jesus were at substantial risk of suffering serious harm due to Kimberly's inability to provide regular care, as a result of her mental impairments or developmental disability, that the parents' history of domestic violence endangered the children's physical and emotional health and safety, and Kimberly had significant cognitive impairments which would require extensive services in order to enable her to appropriately care for and supervise her children. (§ 300, subd. (b).) The petition also alleged that William had created a detrimental, endangering and abusive situation by driving Valerie in a car and failing to place her in a car seat, thereafter becoming involved in an accident that resulted in her death. Valerie's death, which was alleged to have occurred due to William's choice to drive her without securing her in a car seat, also created a potentially detrimental, endangering and abusive or neglectful situation for her brothers, endangering their physical and emotional health and safety, and placing them at risk of physical and emotional harm, damage, danger and death. (§ 300, subds. (f), (j).) At the detention hearing the juvenile court found a prima facie case for detention was shown. The boys were temporarily placed in foster care, and the parents were given monitored visitation.
The contested jurisdictional hearing, initially set for early September, was conducted on October 22. In interviews conducted in preparation for that hearing, the police told DCFS William would likely be charged with "[c]hild [e]ndangerment," although he was unlikely to be sentenced to jail time, because his record was "not bad" and he had not caused the deadly traffic *998 accident. Kimberly continued to acknowledge that she easily became sad, upset and emotional and that she had thrown objects at and hit William. Her anger management problems arose primarily from her extreme jealously and possessiveness toward William. Kimberly admitted she sometimes thought about (but would never actually commit) suicide. Kimberly continued to have concerns about her parenting skills, but expressed a desire to reunite with her husband and sons, so they could live together again as a family. The maternal grandmother told DCFS she thought Kimberly could take care of her sons, as long as she received a great deal of guidance and assistance.
William told DCFS he would participate in any services in order to reunify with his sons. He said he was looking for a place of his own to live. DCFS was not willing to release the boys back into the home of their paternal grandmother, which remained overcrowded, unkempt and unsanitary, and where they had not been appropriately supervised. In its report, DCFS observed that the action, filed under section 300, subdivision (f), in part, satisfied the statutory criteria for the court's denial of reunification services. (§ 361.5, subd. (b)(4).) It was "clear that [William's] negligence caused/contributed to the death of ... Valerie. [William] failed to use proper restraints when transporting the child." Although his extreme negligence in choosing not to use a car seat "cost the life" of and "directly contributed to" Valerie's death, it did "not appear that [William's] intent was to harm, injure or kill the children's sibling. [William] exercised extremely poor judgment which resulted in a horrific consequence." DCFS informed the court that William was extremely remorseful, and had been compliant since the case came to DCFS's attention. Thus, although he was not necessarily entitled to them, by virtue of section 361.5, subdivision (b)(4), DCFS opined that the case involving William's family was one of the rare instances in which the family could benefit from reunification services.
At the hearing on October 22, the parties informed the juvenile court the parents agreed to submit on all counts alleged in the petition, except the count alleged under section 300, subdivision (f). William argued that count should be dismissed because, although he had admittedly been negligent by failing to secure Valerie into a car seat, and she died as a result of injuries sustained as a result of his failure to do so, his conduct did not rise to the level of "criminal negligence" which he argued was necessary to meet the requirements of section 300, subdivision (f).
The trial court disagreed. It observed that section 300, subdivision (f) provides for assertion of juvenile court jurisdiction in cases in which "[t]he child's parent or guardian caused the death of another child through abuse or neglect." In light of the fact that "the law is absolutely clear about buckling a child in a safety seat," which William had clearly neglected to do for his *999 one-year-old daughter, the court observed that it could not "even imagine what the argument could possibly be" that the requirements of section 300, subdivision (f) were not met. The court found by a preponderance of evidence that Ethan and Jesus were dependents of the juvenile court within the meaning of section 300, subdivisions (b), (f) and (j), and sustained the petition, as amended. The court also found, by clear and convincing evidence, that there were no reasonable means to protect the boys short of removal, and placed them in DCFS custody. The parents were given reunification services and monitored visitation. William appealed. DCFS filed a cross-appeal.

DISCUSSION

1. William's appeal

a. The juvenile court properly sustained allegations premised on William's failure to secure Valerie in a car seat

A child may come within the juvenile court's jurisdiction if his "parent or guardian caused the death of another child through abuse or neglect." (§ 300, subd. (f).) William maintains that the "abuse or neglect" contemplated by this statute must rise to the degree of culpability encompassed within the concept of criminal negligence, and that ordinary civil negligence will not suffice. Focusing on legislative changes to the statute, William contends the juvenile court applied the wrong legal standard in sustaining the jurisdictional allegations under section 300, subdivision (f).
Before 1997, dependency jurisdiction was authorized under section 300, subdivision (f) only if the juvenile court found the child's parent or guardian had already been convicted of causing another child's death through abuse or neglect. (Historical and Statutory Notes, 73 West's Ann. Welf. & Inst. Code (2008 ed.) foll. § 300, p. 266; see 10 Witkin, Summary of Cal. Law (10th ed. 2005) Parent and Child, § 547, p. 671.) In 1996, the statute was amended to its current form, deleting the requirement of a criminal conviction. The reasons underlying the change were twofold: First, jurisdictional hearings in dependency actions are almost uniformly held long before the criminal charges arising from a child's death are resolved. The previously lengthy delay prevented a juvenile court from making jurisdictional findings under section 300, subdivision (f) until the parent causing a child's death had actually been convicted of the crime. The shift from requiring a conviction to a merely causal relationship eliminated that problem. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended May 14, 1996, com. 2E, p. o.) The second express goal of the amendment was to "lower the standard of proof by which the parent's cause of the other child's death is found," from the higher "beyond a reasonable doubt" criminal *1000 standard, to the lower mere "preponderance of the evidence" standard required in a civil action. (Ibid.)
William contends that although an express purpose of the statutory revision was to lower the standard of proof to the civil measure, the Legislature intended to limit application of section 300, subdivision (f) solely to those cases in which the parent acts with criminal negligence. He submits that his failure to put Valerie in a car seat (an infraction in violation of Veh. Code, § 27360), was simply not the sort of "flagrant," "aggravated" or "reckless" sort of act that rises to the level of extreme criminal negligence contemplated by the statute.
(1) Our task in construing a statute is to ascertain the intent of the legislators to effectuate the purpose of the statute. (Day v. City of Fontana (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) If the language is clear and unambiguous, the plain meaning rule applies: we presume the Legislature meant what it said. (Ibid.) (2) The language of the statute is simple and clear. A child is within juvenile court jurisdiction if the actions of his "parent ... caused the death of another child through ... neglect." (§ 300, subd. (f).) We find no ambiguity in this language, and nothing in the statute compels us to analyze the Legislature's intended meaning of "negligence." (People v. Thomas (1996) 42 Cal.App.4th 798, 801 [49 Cal.Rptr.2d 856].) Had the Legislature intended section 300, subdivision (f) to be predicated on criminal negligence, we believe it would have expressly said so. (42 Cal.App.4th at p. 801.) But, to the extent an ambiguity may be said to exist, it is readily clarified by the legislative history which specifically provides that the purpose of the 1996 revision was to lessen the evidentiary burden, and "expand[] [the] provision by eliminating the requirement of a conviction of the death of another child, and instead simply provide[] that the parent has `caused' the death of another child." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended May 14, 1996, p. c.) Nowhere is there an indication the Legislature intended to require a finding of criminal negligence.
Not surprisingly, neither we nor William have found any published cases holding that an allegation under section 300, subdivision (f) cannot be sustained in the absence of evidence of criminal neglect. William relies primarily on two cases to support his assertion that criminal negligence is the standard; neither is on point. In Patricia O. v. Superior Court (1999) 69 Cal.App.4th 933 [81 Cal.Rptr.2d 662] (Patricia O.), a mother's boyfriend physically abused her baby, who died of blunt force trauma. The boyfriend had inflicted chronic injuries on the child that would have caused obvious pain and symptoms, such as a spinal fracture that was as old as six weeks, injuries to the baby's humerus that had healed, as well as other injuries that *1001 were weeks old, and bruises of varying ages. (Id. at pp. 936, 938.) Another child told DCFS he had told his mother "`1,000 times'" that her boyfriend regularly hit the baby (and the mother's other children), but "`"she didn't listen."'" (Id. at p. 937.) Juvenile court jurisdiction was not at issue. Rather, in Patricia O. the challenge was whether there was clear and convincing evidence demonstrating the mother's total and complete disregard for her child's welfare, sufficient to justify the juvenile court's decision to deny her reunification services under section 361.5, subdivision (b)(4). The appellate and juvenile courts agreed the mother's neglect had been pervasive; it rose to the level of "criminal culpability" and she could easily have been prosecuted for murdering her child, so that her claim that reunification services under section 361.5, subdivision (b)(4) had been improperly denied "border[ed] on frivolous." (69 Cal.App.4th at pp. 940, 942.)
Jurisdiction was also not at issue in In re Ethan N. (2004) 122 Cal.App.4th 55 [18 Cal.Rptr.3d 504] (Ethan N.). There the victim was a newborn who died as the result of a "golf ball-sized wad of paper lodged deep in his esophagus." (Id. at p. 61.) He also had severe injuries to his rectum and anus, a dozen broken ribs, facial injuries and other obvious wounds suffered as the result of "repeated and extensive abuse." (Ibid.) The mother failed to seek medical care for her child. The appellate court found the juvenile court had abused its discretion by failing to conduct a best interest analysis, and by ordering reunification services under section 361.5, subdivision (c) for the mother. As a parent responsible for the death of a child, it was the mother's responsibility to demonstrate by clear and convincing evidence that reunification was in her other child's best interest; she had not met that burden. (Ethan N., at pp. 63-69.) Both Patricia O. and Ethan N. had advanced beyond the jurisdictional phase, at which the allegations under section 300, subdivision (f) were sustained. (See Patricia O., supra, 69 Cal.App.4th at p. 938; Ethan N., at pp. 59-60.)
Furthermore, the one published decision to address whether section 300, subdivision (f) contains a requirement that children be currently suffering harm or currently at risk of harm holds against such interpretation. In In re A.M. (2010) 187 Cal.App.4th 1380, our sister court addressed this question and squarely rejected the proposition that a current harm or current risk requirement is implied in subdivision (f) despite the fact that the plain language of the statute itself contains no such requirement:
"When `the statutory language is unambiguous, "we presume the Legislature meant what it said, and the plain meaning of the statute governs." [Citation.]' (Whaley v. Sony Computer Entertainment America, Inc. (2004) 121 Cal.App.4th 479, 485 [17 Cal.Rptr.3d 88].) Section 300, subdivision (f), makes no mention and does not require that a minor be at risk of harm for the *1002 court to take jurisdiction over the minor. The statute states that the court has jurisdiction over a minor if the court finds by a preponderance of the evidence that `[t]he child's parent or guardian caused the death of another child through abuse or neglect.' (§ 300, subd. (f).) The language of section 300, subdivision (f), does not require a finding of current risk.
"The language of the statute is in contrast to the remaining subdivisions to section 300. In looking at the language of the remaining subdivisions, including subdivisions (a), (b), (c), (d) and (j), we see that these subdivisions specifically provide provisions allowing a court to take jurisdiction over a minor when a minor is at risk of harm. ([Ibid.]) `"Where a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted."' (In re Connie M. (1986) 176 Cal.App.3d 1225, 1240 [222 Cal.Rptr. 673].) Thus, we conclude the court did not need to make findings that D.M. posed a risk to the minors under the language of the statute." (In re A.M., supra, 187 Cal.App.4th at p. 1389.)
We find this reasoning to be sound.
(3) Moreover, William ignores the fundamental principle that dependency proceedings are civil in nature, not criminal or punitive. (In re Malinda S. (1990) 51 Cal.3d 368, 384 [272 Cal.Rptr. 787, 795 P.2d 1244].) The purpose of dependency law is to protect children, not to prosecute their parents. (Ibid.) Based on the foregoing, we find no support for William's assertion that criminal negligence must be shown to sustain an allegation under section 300, subdivision (f), and thus no error in the court's finding sustaining the allegations under that subdivision.

b. Remaining allegations

William also asserts there is insufficient evidence to support the court's findings sustaining the allegations of section 300, subdivision (b) regarding the risk of harm to Ethan and Jesus due to historical domestic violence between their parents and Kimberly's cognitive limitations. He is mistaken.
(4) First, apart from his attorney's representations at the hearing, the record contains no evidence of William's attendance, progress or completion of the court-ordered programs designed to help him alleviate the problems which led to juvenile court intervention. Nor is there any evidence he has obtained appropriate housing free of the unsatisfactory and unsanitary conditions found at the paternal grandmother's home. Arguments and representations made by counsel do not constitute evidence. (Du Jardin v. City of Oxnard *1003 (1995) 38 Cal.App.4th 174, 179 [45 Cal.Rptr.2d 48]; In re Heather H. (1988) 200 Cal.App.3d 91, 95 [246 Cal.Rptr. 38] ["Evidence" is testimony, writings, material objects, or other things presented to the senses and offered to prove the existence or nonexistence of a fact; "unsworn testimony does not constitute `evidence' ..."].) There is substantial evidence that domestic violence has been a significant part of the life of William and Kimberly's family for quite some time. William and Kimberly were still living together, at least intermittently, in paternal grandmother's home as late as three weeks before Valerie's death in June 2009. Even if the parents were living apart by the time of the October hearing, fewer than four months had passed by the time of that event, and at least Kimberly was still clearly desirous of reuniting with William. Thus, it was not unrealistic for the juvenile court to conclude that William's claim the parties were permanently separate was premature. (5) The effects of domestic violence in the home form a sufficient basis for jurisdiction under section 300, subdivision (b), even if a child is not physically harmed. "[D]omestic violence in the same household where children are living is neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect causes the risk." (In re Heather A. (1996) 52 Cal.App.4th 183, 194 [60 Cal.Rptr.2d 315].)
As for the allegations regarding the impact of Kimberly's cognitive impairments on her ability to care for and supervise the boys, there is no evidence much has changed. By her own admission, Kimberly continues to experience anger management problems, and still needs help controlling her temper and jealousy. Although Kimberly wants to reunite with her children and with William, she has also expressed significant reservations about her ability to provide adequate care and supervision for her sons. There is sufficient evidence to support the juvenile court's findings sustaining the allegations under section 300, subdivision (b), counts b-2 and b-3.[4]

2. DCFS's appeal: The juvenile court erred by dismissing the allegations under section 300, subdivision (b), count b-1

The juvenile court sustained the allegation of the petition under section 300, subdivision (j) which stated that William had created a detrimental and endangering situation by driving Valerie without securing the child in a car seat, an act which resulted in her death. This detrimental and endangering situation in which William negligently placed his daughter was alleged also to have similarly endangered the health and safety of his sons, placing them at risk of physical and emotional harm, damage, danger and even death. This *1004 sustained allegation was identical to the one alleged under section 300, subdivision (b), count b-1, which the juvenile court inexplicably struck when it amended the petition.
(6) A sustained count under section 300, subdivision (j) requires, as a predicate, and as relevant here, sustained counts under section 300, subdivisions (a) or (b).[5] (§ 300, subd. (j).) Accordingly, the portion of section 300, subdivision (b) relating to William as a cause of Valerie's death (for which there is ample evidentiary support as discussed above), must be reinstated and sustained as predicate support for the sustained count under section 300, subdivision (j).

DISPOSITION
The order dismissing the allegation of the petition under section 300, subdivision (b), count b-1 is reversed. The matter is remanded with instructions to reinstate that count. In all other respects, the order is affirmed.
Mallano, P. J., concurred.
ROTHSCHILD, J., Dissenting.
Because the evidence does not show that either Ethan C. or Jesus C. is currently being neglected or at risk of being neglected as the result of William C.'s failure to buckle Valerie C. into her car seat or due to past domestic violence between William and Kimberly G., I disagree with the majority that sufficient evidence supports the finding as to William under Welfare and Institutions Code section 300, subdivision (b) or (f).[1]

I. JURISDICTION BASED ON DEATH CAUSED BY NEGLECT

The court based jurisdiction in part on section 300, subdivision (f), which defines a dependent child as one whose "parent or guardian caused the death of another child through abuse or neglect." William contends that the "neglect" referred to in subdivision (f) must be criminal negligence not ordinary negligence as found by the juvenile court.[2] The majority agrees with the trial court's conclusion that a showing of ordinary negligence is sufficient. In my view, resolution of that issue is unnecessary because jurisdiction under subdivision (f) fails for an independent reason.
*1005 Section 300.2, added in 1996,[3] states in relevant part: "Notwithstanding any other provision of law, the purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused[ or] being neglected ... and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (Italics added.)
By its plain language ("[n]otwithstanding any other provision of law") section 300.2 applies to all subdivisions of section 300 including subdivision (f) and requires a showing in all cases that the children are currently suffering harm or currently at risk of harm. The Legislature's choice of the italicized language was not accidental. By requiring a showing of current risk under section 300.2, the Legislature has created a safety net to avoid removal where the conduct leading to a child's death does not create a current risk of harm to another child.
In an opinion written by the presiding justice of this division, we recognized that section 300.2 "`declares what case law had previously determined: that exercise of jurisdiction must be based upon existing and reasonably foreseeable future harm to the welfare of the child.'" (In re D.R. (2007) 155 Cal.App.4th 480, 486 [66 Cal.Rptr.3d 151], quoting from In re Robert L. (1998) 68 Cal.App.4th 789, 794 [80 Cal.Rptr.2d 578]; see, e.g., In re Melissa H. (1974) 38 Cal.App.3d 173, 175 [113 Cal.Rptr. 139] [dependency jurisdiction requires that "unfitness exist at the time of the hearing"]; In re Morrow (1970) 9 Cal.App.3d 39, 56 [88 Cal.Rptr. 142] [before terminating parental custody and control "[i]t is reasonable to consider ... whether the conditions which gave rise to the cruelty or neglect still persist"]; In re Zimmerman (1962) 206 Cal.App.2d 835, 844 [24 Cal.Rptr. 329] [terminating custody and control of parents who "`are ... morally depraved' [requires] such condition of moral lapse be found to exist at the time of the hearing" (italics omitted)].)[4]
*1006 The majority relies on In re A.M. (2010) 187 Cal.App.4th 1380, 1389 which held that dependency jurisdiction under section 300, subdivision (f), does not require a finding of current risk because, unlike other subdivisions of section 300, there is no such explicit requirement in subdivision (f). In re A.M., however, made no mention of section 300.2 and thus failed to note that the statutory language of that section is unambiguous and applies across the board to all the subdivisions of section 300.
Cases may arise in which a parent's negligence in causing the death of a child is sufficient by itself to support an inference that the surviving children are currently suffering harm or at risk of harm. In re A.M. is such a case. There, a newborn died from suffocation while sleeping in the same bed with his father, mother and older brother. The father heard the baby crying and "making sounds like he was struggling to breathe" but instead of checking on the child he just rolled over and went back to sleep. (In re A.M., supra, 187 Cal.App.4th at p. 1385.) (Maj. opn., ante, at p. 1001.)
This is not such a case. The risk that William's negligence posed to Valerie was the same whether or not an accident occurred yet no one would seriously contend that the risk posed by a single instance of failing to place a child in a car seat is a sufficient basis for imposing juvenile court jurisdiction over the child and her siblings. Indeed, in In re J.N., supra, 181 Cal.App.4th 1010, the court reversed a finding of dependency jurisdiction under section 300, subdivision (b), on facts showing a much more serious lapse in judgment than William's but without the fatal result.
In In re J.N., three children were declared dependents of the court under section 300, subdivision (b), after their father, driving with a 0.20 blood-alcohol level, crashed the family car into a light pole. One of the children, who was not fastened in a car seat, received nine stitches for a laceration to her head. (In re J.N., supra, 181 Cal.App.4th at pp. 1014, 1017.) The mother, who was also in the car, and drunk, allegedly failed to prevent the intoxicated father from driving. The Court of Appeal reversed the judgment of dependency as to all three children. As relevant to our case, the court observed that "[d]espite the profound seriousness of the parents' endangering conduct on the one occasion in this case, there was no evidence from which to infer there is a substantial risk [that] such behavior will recur." (Id. at p. 1026.)
William's single lapse in judgment with respect to Valerie does not support jurisdiction over his other two children under section 300, subdivision (f).

*1007 II. JURISDICTION BASED ON DOMESTIC VIOLENCE

A child comes within section 300, subdivision (b), if the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of ... her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." A child continues to be a dependent child under subdivision (b) "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (Ibid.)
The court sustained the petition under section 300, subdivision (b), with respect to William on the ground that "mother and father have a history of domestic altercations. On prior occasions, the mother and father struck each other. Such altercations endangers [sic] the children's physical and emotional health and safety and places them at risk of harm."
William does not dispute the evidence of domestic violence between Kimberly and him, but contends there is no evidence that either child suffered or was at substantial risk of suffering "serious physical or emotional harm" as a result of these altercations as required by subdivision (b).[5] The record supports William.
The record contains no evidence showing that Ethan or Jesus suffered any physical harm as a result of the physical and verbal altercations between their parents or that they were at risk of suffering such harm in the future. Instead of relying on evidence, the DCFS relies on dictum in In re Heather A. (1996) 52 Cal.App.4th 183, 194 [60 Cal.Rptr.2d 315] (Heather A.) that children are at risk of harm as the result of their parents' physical violence because they run a "substantial risk of encountering the violence and suffering serious physical harm or illness from it." Although the court in Heather A. entertained the possibility that mere exposure to domestic violence might satisfy *1008 the jurisdictional requirements of section 300, subdivision (b), the court upheld the juvenile court's jurisdiction under subdivision (b) because the record contained evidence of actual physical injury to one of the children resulting from a fight between the parents. "During one of the incidents, Father smashed a glass vase and one of the minors cut her finger and foot on the glass and needed medical attention." (52 Cal.App.4th at p. 188.) The court found that "it was the domestic violence which caused both the breaking of the vase and the delay in cleaning up the broken glass." (Id. at p. 194, fn. 9.)[6]
Even if exposure of children to any domestic violence could alone establish jurisdiction under section 300, subdivision (b), the DCFS has not cited any evidence that such exposure occurred in this case and a review of the record has disclosed none, either before or after the detention hearing.
Further, the record contains no evidence of any domestic violence between the parents since they have lived apart. Nor does the record contain any other evidence of William participating in domestic violence that might reasonably suggest the children would be exposed to such violence in the future. Unlike the father in Heather A., relied upon by the DCFS, there is no evidence that William has been abusive to any other person. In contrast in Heather A. the court affirmed the removal of the children from their father's custody based in part on evidence that the father "move[d] from one domestic relationship to another" and had a "`long history of disruptive emotional relationships with women.'" Thus, the court concluded, even if the father had no further contact with the mother or stepmother, "there was good reason to believe he would enter into another domestic relationship with someone else and his pattern of domestic abuse would continue." (Heather A., supra, 52 Cal.App.4th at pp. 194-195.)
Because the record contains insufficient evidence that the children have suffered or are at risk of suffering serious physical harm there is no basis for jurisdiction under section 300, subdivision (b).
The Legislature expressed a preference that children be raised by their parents unless very good reasons, and only those expressly provided by legislation, demand that they be raised by others. Thus we are bound by the provisions of section 300, subdivision (b), which do not permit the juvenile court to assert jurisdiction over a child in the absence of actual physical harm or a substantial risk of such harm and then "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." And *1009 the record in this case, as to William, shows that the evidence does not support jurisdiction under section 300, subdivision (b), on the grounds alleged.[7]
NOTES
[1] Undesignated statutory references are to the Welfare and Institutions Code.
[2] Unspecified date references are to 2009.
[3] The child, left unsupervised, had fallen out of bed. Until William returned, no one had noticed Valerie's injury.
[4] We need not address William's argument that the allegations of section 300, subdivision (j) must be dismissed. That argument hinges on dismissal of the allegations of section 300, subdivision (f), for which we find ample evidentiary support.
[5] The court struck the allegations under section 300, subdivision (a) regarding the parents' domestic violence. That ruling is not at issue.
[1] All statutory references are to the Welfare and Institutions Code.
[2] Criminal negligence is negligence that is "`aggravated, culpable, gross, or reckless....'" (People v. Penny (1955) 44 Cal.2d 861, 879 [285 P.2d 926].)
[3] Stats. 1996, chapter 1084, section 2, page 7603.
[4] There is a split of authority as to whether proof of a current or future risk of harm is required before jurisdiction can be found under section 300, subdivision (b), which refers in part to a child who "has suffered" serious physical harm. (Compare In re J.N. (2010) 181 Cal.App.4th 1010, 1021-1025 [104 Cal.Rptr.3d 478] [evidence must show current risk] with In re Adam D. (2010) 183 Cal.App.4th 1250, 1261-1262 [108 Cal.Rptr.3d 611] [current risk not required].) That issue is irrelevant to the determination of jurisdiction under subdivision (f) because subdivision (f) does not contain the past tense ("has suffered") language of subdivision (b). If anything, the Legislature's failure to use the past tense language in subdivision (f) is all the more reason to interpret subdivision (f) as requiring proof of a current or future risk of harm. "`It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.'" (Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 725 [257 Cal.Rptr. 708, 771 P.2d 406], citations omitted.)
[5] The petition alleged that the parents' domestic violence placed the children at risk of emotional as well as physical harm. The risk of emotional harm requires proof of "serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." (§ 300, subd. (c).) Neither the majority nor the Los Angeles County Department of Children and Family Services (DCFS) contends there was sufficient evidence to sustain the petition on the ground of risk of serious emotional damage.
[6] It is not necessary in this case to decide whether a single incident of harm is sufficient to support jurisdiction under section 300, subdivision (b). (See In re J.N., supra, 181 Cal.App.4th at p. 1023.) In the case before us, there were no incidents of harm to the children.
[7] Although there may be sufficient evidence to support jurisdiction over Ethan and Jesus under section 300, subdivision (b) based on William's neglect of the children's health and well-being, neglect was not charged in the original petition nor was the petition amended to add that charge, so William did not have notice of that ground or the alleged facts supporting it. Nevertheless, nothing would prevent the DCFS on remand from amending the petition to allege different factual grounds for jurisdiction so long as William is given reasonable notice and opportunity to defend.