Filed 7/5/12

# IN THE SUPREME COURT OF CALIFORNIA

In re ETHAN C. et al., Persons Coming  )
Under the Juvenile Court Law.  )
_____)
 )
LOS ANGELES COUNTY  )
DEPARTMENT OF CHILDREN  )
AND FAMILY SERVICES,  )
 )
   Plaintiff and Appellant,  )
 )     S187587
 )
   v.  )
 )   Ct.App. 2/1 B219894
WILLIAM C.,  )
 )   Los Angeles County
   Defendant and Appellant.  )  Super. Ct. No. CK-78508
_____)

Under certain circumstances, found by a preponderance of evidence, and indicating that a minor child is bereft of care or support by a parent or guardian, or has suffered or risks actual or threatened serious injury, illness, emotional damage, or sexual abuse because of a custodial parent's or guardian's inadequacy, neglect, or mistreatment, the child may be adjudged a dependent of the juvenile court. (Welf. & Inst. Code, § 300.)[1] A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care. But it is merely a first step, and the system includes

_____

[1] All further unlabeled statutory references are to the Welfare and Institutions Code.

many subsequent safeguards to ensure that parental rights and authority will be restricted only to the extent necessary for the child's safety and welfare.

Thus, unless a custodial parent or guardian has abandoned or voluntarily relinquished the child, the court may not remove a dependent child from the parent's or guardian's physical custody unless it finds, by clear and convincing evidence, that such action is necessary to protect the child from serious harm. (§ 361, subd. (c).)  Even if removal is ordered, the court must provide social services, including family reunification services, designed to facilitate the parent's or guardian's resumption of full custody and control, unless the court finds specified circumstances by clear and convincing evidence.  (§ 361.5.)  Only if the court permissibly denies reunification services, or such services have failed, may the court conduct permanency planning proceedings that contemplate a final termination of parental rights.

Among the findings allowing an initial adjudication of dependency is that "[t]he child's parent or guardian *caused* the death of *another child* through abuse *or neglect*."  (§ 300, subd. (f), italics added (section 300(f)).)  Here, a father's two young surviving children were adjudged juvenile court dependents, in part because of findings under section 300(f).  These findings were based on evidence that, in violation of law, the father transported his third child, an 18-month-old daughter, in an automobile without securing her in a child safety seat, and she was fatally injured when another vehicle collided with their car.  The Court of Appeal affirmed the juvenile court's judgment.

We granted the father's petition for review to address three issues:  First, does the lethal neglect to which section 300(f) refers require *criminal* negligence, i.e., a degree of culpable misfeasance or malfeasance that would support the parent's or guardian's *criminal conviction* for causing a child's death?  Second, does section 300(f) require discrete evidence and findings that the particular

2

circumstances of the child fatality demonstrate a current risk of substantial harm to surviving children in the parent's or guardian's care?  Third, what is the meaning of "caused," as used in section 300(f); i.e., is a substantial or contributing cause sufficient, and what is the effect, if any, of any intervening or superseding cause?

Like the Court of Appeal majority in this case, we conclude that section 300(f) does not limit its application to criminal negligence.  On the contrary, section 300(f) allows (but does not require) the juvenile court to adjudge a child a dependent if the court finds that the want of ordinary care by the child's parent or guardian caused another child's death.  We further conclude that the juvenile court may adjudicate dependency under section 300(f) without any additional evidence or finding that the circumstances surrounding the parent's or guardian's fatal negligence indicate a present risk of harm to surviving children in the parent's or guardian's custody.

Finally, we determine that normal concepts of legal causation apply under section 300(f).  Here, we are persuaded, the father's negligent failure to secure his young daughter in a child safety seat was a substantial contributing cause of her death in an ensuing traffic accident.  The father's counsel conceded as much in the juvenile court.  Nor does the evidence permit a conclusion that the accident itself was an unforeseeable intervening or superseding event that absolves the father of causation responsibility.  The "superseding cause" doctrine cannot apply where, as here, the duty the father breached is intended to guard against the precise, and thus foreseeable, risk that materialized, i.e., a young child's injury or death in a traffic collision.

Accordingly, we will affirm the judgment of the Court of Appeal.

3

## FACTS AND PROCEDURAL BACKGROUND[2]

Defendant William C. (William)[3] and his wife Kimberly G. (Kimberly) had three children, Ethan C. (Ethan), born in January 2006, Valerie C. (Valerie), born in November 2007, and Jesus C. (Jesus), born in November 2008. In March or April of 2009, William and Kimberly separated. Kimberly returned to her family's home, while Ethan, Jesus, and Valerie lived with William in the home of his mother (the children's paternal grandmother).

On June 17, 2009, William left Valerie in the care of his mother and sister. When he returned to the house, he noticed that Valerie's arm was injured. He decided to take her to the hospital to have the arm examined. During the trip, Valerie was not secured in a child safety seat; she sat on an adult relative's lap. En

---

[2]     The circumstances leading to the adjudications of Ethan and Jesus as dependent children are, for the most part, distilled and condensed from the Court of Appeal opinion. These, in turn, are based on three case reports by plaintiff Los Angeles County Department of Children and Family Services (Department) that were admitted in evidence at the October 22, 2009, jurisdictional/dispositional hearing: a detention report filed, along with the dependency petition, on August 18, 2009, a jurisdiction/disposition report filed on September 8, 2009, and a document entitled "Last Minute Information for the Court" filed on October 22, 2009. No additional evidence was introduced at the jurisdictional/dispositional hearing. The parties submitted the matter on the reports listed above. With one exception discussed below, defendant has not significantly disputed the pertinent facts as set forth in these reports and in the Court of Appeal opinion.

[3]     In defendant's brief on the merits in this court, counsel advises that while defendant's legal given name appears to be Williamson, defendant more commonly uses William and prefers that usage. The Court of Appeal identified defendant as William, both in the case title and in the text of its opinions. In the captions of their briefs in this court, all parties have used Williamson. However, to maintain title symmetry with the Court of Appeal decision, and to facilitate tracking and legal research by the bench, bar, and public, we continue to identify defendant as William. (See *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 506, fn. 1.)

4

route to the hospital, another vehicle collided with William's car. Valerie died as the result of blunt force injuries. There is no indication William was at fault for the traffic accident itself.[4]

A week after Valerie's death, the Department responded to a report that Ethan and Jesus were victims of general neglect by their parents. Investigation revealed that the household in which William was living with the children included as many as 20 persons. The conditions were unsanitary, and the children in the household were dirty and seemed unsupervised. In particular, three-year-old Ethan appeared to be a victim of inadequate care, and he showed signs of delayed development. He lacked language skills, was confused about the difference between day and night, did not know how to use eating utensils, and had several rotten teeth that required extraction.

The Department investigators were told that Kimberly had a history of sometimes suicidal depression, anger management problems, a diagnosis of borderline personality disorder, and cognitive impairments that limited her functioning to the level of an 11 year old. They learned the couple had engaged in episodes of domestic violence, with Kimberly as the primary aggressor. Members of Kimberly's family indicated she could care take care of her children, but only with extensive help and guidance. A psychologist expressed serious reservations about her ability to do so. On the other hand, members of Kimberly's family insisted that the children had been seriously neglected in the home of William's relatives, and that Jesus and Ethan would be in danger if they remained there.

---

[4]    The Court of Appeal described the accident as follows: "As William, who had the right-of-way, drove into an intersection, another car traveling at a high rate of speed ran through a stop sign and struck William's car, causing it to spin into another car. William's car was then struck by a fourth vehicle."

5

William expressed extreme remorse about the fatal accident. He told the investigators that Valerie's arm injury apparently happened when she fell out of bed while unsupervised. He explained that when he decided to take Valerie to the hospital, his car, which had a child safety seat, was being used by someone else, and he was unable to get another seat from Kimberly, so he drove to the hospital with Valerie sitting unsecured in his sister's lap. Kimberly indicated she was not sure William ever had a child safety seat.

Initially, William, Kimberly, and the Department agreed to a voluntary plan whereby Ethan and Jesus would be temporarily removed from the physical custody of the parents, who would be allowed monitored visits with the children and would participate in a family reunification program. William began parenting classes and grief counseling. However, the Department's concern about his failure to leave his mother's home and establish a safe living environment for Ethan and Jesus, the pending criminal investigation against him in connection with Valerie's death,[5] and Kimberly's serious mental health, cognitive, anger management, and physical violence issues, led to a departmental recommendation that the juvenile court take jurisdiction.

---

[5] At the time the dependency petition was filed, the Department had been advised that William likely faced child endangerment charges in connection with Valerie's death. In 2010, after the dependency adjudications at issue here, William was charged with felony child endangerment (Pen. Code, § 273a, subd. (a) [child's caretaker's or custodian's willful placement of child in situation dangerous to child's health or person]) based on his failure to restrain Valerie in a child safety seat. By a letter to this court dated March 29, 2012, William's counsel represents that William recently admitted a violation of Vehicle Code section 27360, subdivision (a) (transporting a young child on a highway in a motor vehicle without securing the child in a safety seat), and received the maximum $100 fine for this infraction. According to counsel, all felony and misdemeanor charges relating to Valerie's death were dismissed.

On August 18, 2009, the Department filed a dependency petition alleging that Ethan and Jesus came within the juvenile court's jurisdiction under the provisions of section 300, subdivisions (a), (b), (f), and (j). Under subdivisions (a) and (b), the petition alleged that the parents' history of domestic violence placed the children at risk of serious harm (allegations a-1, b-2). The petition further alleged under subdivision (b) that the children were placed in an endangering situation, and were at risk of serious harm, because Kimberly's cognitive limitations required the provision of extensive services to enable her to properly supervise and care for her children (allegation b-3). Finally, the petition alleged under subdivisions (b), (f), and (j) that William had placed Ethan and Jesus at serious risk by driving their sibling, Valerie, without the use of a child safety seat, which omission resulted in Valerie's death in a traffic accident (allegations b-1, f-1, j-1).

After a detention hearing that same day, and finding statutory cause, the juvenile court ordered Ethan and Jesus removed from the parents' physical custody pending a jurisdiction/dispositional hearing. The court authorized the Department to place the children with any suitable relative, or in foster care, and the parents were granted monitored visits.

The jurisdictional/dispositional hearing occurred on October 22, 2009. As noted, both parties waived trial and submitted on the basis of the reports prepared by the Department's social workers. William's counsel was permitted to argue, and did argue, that the allegations under section 300, subdivisions (b), (f), and (j) should not be sustained insofar as they were based on William's failure to secure Valerie in a child safety seat.

In making this argument, William's counsel first asserted the Department reports were mistaken in claiming that Valerie was thrown from the car in the accident. Counsel represented that the Department's attorney "was willing" to

7

enter a stipulation to that effect. According to counsel, "[Valerie] was not thrown from the car. [William's] mother was thrown from the car from the front seat. [Valerie] sustained head injuries in the backseat and died from blunt force trauma to the head." However, counsel agreed, "*it is true*, as alleged, that [Valerie] *died* from injuries sustained *as a result of not being strapped in a safety seat*. That is what it says." (Italics added.)

Nonetheless, counsel urged, dependency jurisdiction over surviving children cannot be based on a parent's mere ordinary negligence causing death to another child; the parent's acts or omissions, he insisted, must have risen to the level of criminal negligence. William's failure to secure Valerie in a child safety seat, counsel argued, was no more than ordinary negligence, and thus would not support jurisdiction.

At the conclusion of the hearing, the court ordered allegations a-1 (domestic violence raising danger of nonaccidental injury to children) and b-1 (danger to siblings from Valerie's death while not restrained in child safety seat) dismissed or stricken. However, the court sustained, by a preponderance of evidence, allegations b-2 (risk of harm to children from parents' domestic violence) and b-3 (danger to children from Kimberly's cognitive impairments) and the remaining allegations based on the fatal traffic accident (allegations f-1, j-1). On the safety seat issue, the court observed, "the law is absolutely clear about buckling a child in a child safety seat. I mean, I can't even imagine what the argument could possibly be. [¶] . . . The [section] 300([f]) count says the following: The child's parent or guardian caused the death of another child through abuse or neglect. [¶] He neglected to put his one-year-old child in a child safety seat . . . ."

The court adjudged Ethan and Jesus to be dependent children. By clear and convincing evidence, the court further found that returning physical custody to

8

William and Kimberly would create a substantial risk of danger to the children's physical and emotional well-being, and that there were no reasonable means of protecting them without removing them from the parents' physical custody. Accordingly, the court placed the children under the Department's physical supervision. With the Department's approval, the court further ordered that William and Kimberly should be allowed monitored visits with the children, and should receive family reunification services.

William appealed, urging that the allegations under subdivisions (f) and (j) of section 300 (allegations f-1 and j-1, respectively) could not be sustained on the basis of his mere civil negligence in failing to secure Valerie in a child safety seat.[6] William also argued there was insufficient evidence to sustain the allegations under subdivision (b) of section 300 concerning danger to the children from the parents' domestic violence and Kimberly's cognitive impairments (allegations b-2 and b-3, respectively). The Department also appealed, asserting that the trial court had improperly dismissed the allegations under subdivision (b) of section 300 that were also based on the safety seat incident (allegation b-1).

In a split decision, the Court of Appeal for the Second Appellate District, Division One, rejected William's arguments and accepted the Department's. The Court of Appeal reversed the trial court's dismissal of allegation b-1, but otherwise affirmed.

In the Court of Appeal, William made two arguments that Valerie's traffic death while she was unrestrained in a child safety seat could not be a basis for dependency jurisdiction. First, William urged, as in the trial court, that the "abuse or neglect" leading to a child fatality, as specified in section 300(f), requires

---

**6** Kimberly did not appeal, and has not been involved the proceedings either in the Court of Appeal or in this court.

9

criminal negligence — flagrant, aggravated, or reckless conduct — not a mere ordinary breach of care such as his single failure to secure Valerie properly in his vehicle. Second, he insisted that the lack of a safety seat was not a "substantial contributing cause" of Valerie's death, which was the result of a traffic accident in which another driver was entirely at fault.

In rejecting the first argument, the Court of Appeal majority noted that section 300(f) requires only a parent's or guardian's "abuse or *neglect*" (italics added) as a cause of another child's death. Nothing in the statute's plain words, the majority noted, suggests that "neglect" means anything more than ordinary negligence. If there is ambiguity, the majority concluded, it is resolved by the legislative history of section 300(f), on which William's argument also relied.

As both William and the Court of Appeal noted, prior to 1996, dependency jurisdiction under section 300(f) required the parent's or guardian's *criminal conviction* of causing another child's death. The stated purposes of the 1996 revision were to eliminate the delay attendant on criminal proceedings, and to substitute a civil (preponderance of evidence) for a criminal (beyond reasonable doubt) standard of proof.

William urged, however, that the implicit requirement of a criminal *degree* of negligence was unchanged by the 1996 amendment. The majority disagreed. The Legislature, the majority reasoned, sought to *lessen* the burden of establishing a "child fatality" basis for dependency jurisdiction by reverting to language that simply requires neglect by a parent or guardian, resulting in the death of another child. Such a construction, the majority observed, is consistent with the dependency statute's civil nature, and with its nonpenal purpose to protect children who are at risk in their parents' or guardians' care. Hence, the majority

10

concluded, the allegations based on William's failure to secure Valerie in a child safety seat, after which she died in a traffic accident, were properly sustained.**7**

The Court of Appeal dissent urged it was unnecessary to determine what level of negligence is necessary for dependency jurisdiction under section 300(f), because that provision requires that the surviving children under a parent's or guardian's care *have suffered*, or are *currently at risk* of, physical, sexual, or emotional harm. In the dissenter's view, William's single failure to secure Valerie in a child safety seat, however tragic its consequences, was insufficient evidence of current risk of injury or harm to Ethan and Jesus.

William sought review, raising the "criminal negligence" and "current risk of harm" issues.**8** We granted review, and directed that, in addition to the arguments raised by the petition, the parties address the meaning of "caused," as used in section 300(f). Thus, our order provided that "[i]n addition to the issues specified in the petition for review, the parties are ordered to brief the following issue: What is the definition of the word 'caused' in the context of dependency jurisdiction under Welfare and Institutions Code section 300, subdivision (f)? Does it mean the sole cause, or the contributing cause, or should the existence of an intervening, superseding cause be considered as part of the analysis?" We turn to these issues.

---

**7** The Court of Appeal majority did not focus on the separate assertion by William that his negligence did not "cause[ ]" Valerie's death, within the meaning of section 300(f).

**8** William did not seek review of the Court of Appeal's rejection of his appellate claims that there was insufficient evidence to support dependency jurisdiction on the grounds of domestic abuse between the parents and Kimberly's cognitive impairments.

# DISCUSSION[9]

## 1. Overview of dependency scheme.

"Notwithstanding any other provision of law," the purpose of the juvenile dependency law (§ 300 et seq.) "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) "The focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (*Ibid.*)

The juvenile court takes a first, and preliminary, step in its protective duties by adjudging a minor to be a dependent of the court. With qualifications not pertinent here, a minor may be adjudged a dependent (§§ 300, 360, subd. (d)) if the juvenile court finds, by a preponderance of evidence (§ 355, subd. (a)), any of the following: (1) the child has suffered or is at risk of suffering (A) serious, nonaccidental physical harm inflicted by a parent or guardian (§ 300, subd. (a)) or (B) serious physical harm or illness because of a parent's or guardian's (i) "failure or inability" to adequately supervise the child, (ii) "willful or negligent" failure to provide the child with adequate food, clothing, shelter, or medical treatment, or (iii) inability, due to mental illness, developmental disability, or substance abuse,

---

[9] We note that amici curiae briefs have been filed on behalf of William by William Wesley Patton, a Whittier Law School professor, and by the Los Angeles County Public Defender. An amicus curiae brief has been filed on behalf of the Department by the California State Association of Counties. We also granted William's application that we consider, as part of his briefing in this matter, amici curiae briefs that were filed on the parent's behalf in a companion matter in this court, *In re L.L.* (review granted Mar. 30, 2011, S190230), by (1) California Appellate Defense Counsel, (2) Los Angeles Dependency Lawyers, Inc. and (3) sociology professors Drs. Amy D'Andrade and Jill Berrick.

12

to provide regular care for the child (*id.*, subd. (b)); (2) the child is suffering serious emotional damage because of a parent's or guardian's conduct or because there is no parent or guardian capable of providing appropriate care (*id.*, subd. (c)); (3) the child has been sexually abused (A) by a parent, guardian, or household member, or (B) by another person when the parent or guardian "knew or reasonably should have known" of the danger of abuse but failed to adequately protect the child (*id.*, subd. (d)); (4) the child is under five years old, and has suffered serious physical abuse by a person known to the parent or guardian, if the parent or guardian "knew or reasonably should have known" that the abuse was occurring (*id.*, subd. (e)); (5) "[t]he child's parent or guardian *caused the death of another child through abuse or neglect*" (*id.*, subd. (f), italics added); (6) the child has been abandoned without support, or an incarcerated or institutionalized parent or guardian is unable to arrange for appropriate care, or the parent's whereabouts are unknown and no other relative or adult custodian is willing to provide care and support (*id.*, subd. (g)); (7) the child has been freed for adoption by relinquishment or by termination of parental rights, or an adoption petition has not been granted (*id.*, subd. (h)); (8) the child has suffered acts of cruelty by a parent, guardian, or household member, or the parent or guardian "knew or reasonably should have known" the child was in danger of suffering acts of cruelty but failed adequately to protect the child from such acts (*id.*, subd. (*i*)); or (9) "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (*i*)," and under the particular circumstances surrounding the abuse or neglect of the sibling "there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions" (*id.*, subd. (j)).

If the child has been taken into temporary protective custody, and remains in custody at the time the dependency petition is filed (see § 305 et seq.), the court must promptly hold a detention hearing to determine whether he or she should be

13

returned to the parent or guardian pending the jurisdictional/dispositional hearing. (§§ 315, 319.) Absent other extenuating circumstances that make the child's release to the parent or guardian impossible or impractical (see § 319, subd. (b)(2)-(4)), the court must order such release from custody unless it makes specific findings that the child's physical health is in danger, or the child is suffering severe emotional damage, and there are no means of protecting the child's physical or emotional health except by removing the child from the parent's or guardian's custody. (*Id.*, subds. (b), (e).) The court must consider whether there are available services that would prevent the need for further detention (*id.*, subd. (d)(1)), must provide such services if it believes they will allow the child to be returned to the parent or guardian (*id*., subds. (b), (e), (d)), and, in the event further detention is warranted, may order the child's placement with a suitable relative (*id.*, subd. (f)).

Even after a dependency finding has been made, the statutory scheme is designed to allow retention of parental rights to the greatest degree consistent with the child's safety and welfare, and to return full custody and control to the parents or guardians if, and as soon as, the circumstances warrant. Thus, the juvenile court may limit the parent's or guardian's supervision and control of the child in specified ways (§§ 361, subd. (a), 362), but it cannot remove the child from the parent's or guardian's physical custody, except in cases of voluntary relinquishment of the child, unless it finds, by clear and convincing evidence, that such custody would pose a substantial threat to the child of physical harm or sexual abuse, or that the child is suffering extreme emotional damage, and that there are no reasonable means of protecting the child's physical or emotional well-being short of such removal. (§ 361, subds. (b)-(d).) If separation from one parent or guardian, but not both, is necessary, the court may consider the alternatives of removing the offending parent from the child's home or allowing

14

the nonoffending parent to retain custody. (*Id.*, subd. (c)(1).) If a fit nonresident parent is willing to assume custody, the court must order such placement (§ 361.2, subds. (a), (e)(1)), and it may otherwise authorize placement of the child in the approved home of a relative or a nonrelative extended family member (*id.*, subd. (e)(2), (3)). Preferential consideration must be given to a request for placement by a fit relative of the child. (§§ 361.3, 361.4.)

Other than in cases of voluntary relinquishment, the general rule is that when a dependent child is removed from the parent's or guardian's physical custody, child welfare services, including family reunification services, must be offered. (§ 361.5, subd. (a).) Reunification services "need not" be provided, however, when the court finds, by clear and convincing evidence, the existence of one or more specified circumstances, including the parent's or guardian's unknown whereabouts; mental disability; disinterest; severe untreated substance abuse; poor reunification performance, failure to obtain reunification services, or loss of parental rights, in another dependency case; indicators of violent recidivism; or severe or chronic abuse or neglect of the dependent child, a sibling, or another child. (*Id.*, subd. (b).) Among the findings that will permit a denial of reunification services is that "the parent or guardian . . . has caused the death of another child through abuse or neglect." (*Id.*, subd. (b)(4).) But even in these specified circumstances, the court may provide reunification services if it finds, by clear and convincing evidence, that reunification is in the dependent child's best interest. (*Id.*, subd. (c).)[10]

When offered, reunification services must be provided for at least six months unless earlier terminated for cause (§ 361.5, subd. (a)(2)), and for up to 24

---

[10]  As noted, the instant juvenile court ordered reunification services for William, and thus implicitly made such a finding.

months when it appears such extended services will result in the dependent child's return to the parent's or guardian's custody (*id.*, subd. (c)(3), (4)).  Meanwhile, court status reviews must occur at least every six months, to determine whether reunification efforts should continue or be terminated for cause, and whether the dependent child may be returned to the parent or guardian.  (§§ 366, 366.21.)  At an 18-month permanency review hearing, the court must order the child's return unless the social worker responsible for managing the case can demonstrate, by a preponderance of evidence, that such return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).)  If the child is not returned at this point, the court must order a permanency planning hearing (*ibid.*), at which parental rights may be terminated and the child may be placed for adoption (§ 366.26), except that permanency planning may be postponed in limited circumstances where a six-month extension of reunification services is permitted (§ 366.22, subd. (b)).

**2.  Does a finding under section 300(f) require criminal negligence?**

William first urges that an initial adjudication of dependency based on the parent's or guardian's neglect leading to the death of another child (§ 300(f)) requires evidence that the parent or guardian was guilty of criminal negligence, not a mere want of ordinary care.  We disagree.

We have indicated that " '[c]riminal negligence refers to " 'a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless.' " [Citations.]' " (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 399 (*Stark*).)  We see nothing in section 300(f)'s language, history, or policies that demands such a standard.

When construing a statute, we look first to its words, " 'because they generally provide the most reliable indicator of legislative intent.' [Citation.]  We give the words their usual and ordinary meaning [citation], while construing them

16

in light of the statute as a whole and the statute's purpose [citation]." (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529-530.) " 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.] 'Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation.' [Citation.]" (*Id.*, at p. 530.)

The noun "neglect" has a commonly understood meaning that is not confined to particularly gross, reckless, or blameworthy carelessness. For example, lay dictionaries define "neglect," when used as a noun, as "[w]ant of attention to what ought to be done; the fact of leaving something undone or unattended to; negligence" (10 Oxford English Dict. (2d ed. 1989) p. 301, col. 2); "the action of neglecting something," where to "neglect" (as a verb) is "to fail to attend to sufficiently or properly : not give proper attention or care to" or "to carelessly omit doing (something that should be done)" (Webster's 3d New Internat. Dict. (2002) p. 1513, col. 3); or the "act or an instance of neglecting something" (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 830, col. 1)), where to "neglect" (as a verb) is "to leave undone or unattended to esp. through carelessness" (*id.*, p. 829, col. 2) or "[t]o fail to do or carry out, as through carelessness or oversight" (American Heritage Dict., (2d coll. ed. 1985) p. 835, col. 2).

Resort to the most prominent legal reference work yields a similar result. Black's Law Dictionary (8th ed. 2004) (Black's) defines the noun "neglect" as "1. [t]he omission of proper attention to a person or thing, whether inadvertent, negligent, or willful; the act or condition of disregarding" or "2. [t]he failure to

give proper *attention*, *supervision*, or necessities, *esp. to a child*, to such an extent that *harm results or is likely to result*." (*Id.*, p. 1061, col. 1, italics added.)[11]

Moreover, we derive no different sense of the word "neglect," as used in section 300(f), by reading this subdivision in conjunction with the other provisions of section 300. Thus, section 300 permits such an adjudication where, for example, a child has suffered, or is at risk of suffering, serious harm because of the parent's or guardian's (1) "failure or inability" to "adequately supervise or protect" the child (§ 300, subd. (b)) or (2) "willful *or negligent* failure" to "adequately . . . protect" the child from a custodian with whom the child has been left or to provide the child with adequate food, shelter, or clothing (*ibid.*, italics added); or because the parent or guardian has "failed" to "adequately protect" the child against actual or threatened sexual abuse, or from acts of cruelty, of which the parent or guardian "knew or reasonably should have known" (*id.*, subds. (d), (*i*)); or because a very young child has suffered severe physical abuse of which the parent or guardian "knew or reasonably should have known" (*id.*, subd. (e)); or when there is a substantial risk that the child will be "abused or neglected," *as measured by these standards*, because his or her sibling has been similarly

---

**11** In a note immediately following this definition, Black's observes: " ' "Neglect" is not the same thing as "negligence." In the present connection the word "neglect" indicates, as a purely objective fact, that a person has not done that which it was his duty to do; it does not indicate the *reason* for this failure. . . . A man can "neglect" his duty either intentionally or negligently.' [Citation.]" (Black's, p. 1061.) Black's also defines subcategories of "neglect" that are commonly expressed in law, including "child neglect" ("[t]he failure of a person responsible for a minor to care for the minor's emotional or physical needs"), "culpable neglect" ("[c]ensurable or blameworthy neglect; neglect that is less than gross carelessness but more than the failure to use ordinary care"), and "willful neglect" ("[i]ntentional or reckless failure to carry out a legal duty, esp. in caring for a child") (*ibid.*), but section 300(f) uses none of these qualifying terms.

18

"abused or neglected" (*id.*, subd. (j)). Nothing in these terms suggests that when serious harm to a child has occurred or is threatened, the Legislature intended to limit the neglect that can result in dependency to criminal negligence.

We also note the definition of "neglect" contained in the Child Abuse and Neglect Reporting Act. (Pen. Code, § 11164 et seq.) The purpose of this law is to protect children from "abuse and neglect" (*id.*, § 11164, subd. (b)) by requiring certain persons who, in their professional or employment capacities, come into regular contact with children (*id.*, § 11165.7) to report their knowledge or reasonable suspicions that particular children are being abused or neglected (*id.*, §§ 11166, 11166.05). For purposes of this statute, "neglect" is defined as "the *negligent* treatment or the maltreatment of a child by a person responsible for the child's welfare under circumstances indicating harm or threatened harm to the child's health or welfare. The term includes both acts and omissions on the part of the responsible person." (*Id.*, § 11165.2, italics added.)

Though the meaning of "neglect," as used in section 300(f), thus seems plain and unambiguous on its face, William urges that the history of this particular provision compels a different interpretation. As below, William stresses that prior to 1997, section 300(f) specified that a child came within the juvenile court's jurisdiction, and could be adjudged a dependent child of the court, if "[t]he minor's parent or guardian *has been convicted of causing* the death of another child through abuse or neglect." (Former § 300(f), as adopted by Stats. 1987, ch. 1485, § 4, p. 5603, italics added.) Any such criminal conviction, William reasons, would necessarily have required not merely a breach of ordinary care, but a criminal level of abuse or neglect — i.e., an " ' " 'aggravated, culpable, gross, or reckless' " ' " act or omission (e.g., *Stark*, *supra*, 52 Cal.4th 368, 399) — leading to the child's death. (Pen. Code, § 20; see, e.g., *People v. Anderson* (2011) 51 Cal.4th 989, 994; *People v. Concha* (2009) 47 Cal.4th 653, 660; but cf. Pen.

19

Code, § 192, subd. (c)(2) [crime of vehicular manslaughter includes traffic death caused by driver's unlawful, nonfelonious act without gross negligence, or his or her lawful, potentially lethal act, performed in unlawful manner without gross negligence].) Hence, William suggests, the word "neglect," as used in former section 300(f), included the implicit requirement of a "criminal," or "gross," absence of care.

In 1996, however, section 300(f) was amended to *delete* the requirement of a criminal conviction, and to provide simply for dependency jurisdiction on the basis that "[t]he minor's parent or guardian *caused* the death of another child through abuse or neglect." (Stats. 1996, ch. 1082, § 1, p. 7426, italics added.) The legislative history of the 1996 amendment, William notes, indicates its purposes were (1) to lower the dependency *standard of proof*, in child fatality cases, from the criminal standard of beyond a reasonable doubt to the usual civil dependency standard of a preponderance of evidence, and (2) perhaps to avoid the delay of waiting for a criminal adjudication before proceeding in the dependency matter. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended May 14, 1996, pp. *o*-p.) But these aims, William argues, implied no third purpose — to change the meaning of "neglect," as used in the prior version of subdivision (f), from the criminal level to a mere civil level of negligence.

However, we find nothing in section 300(f)'s legislative history to support either William's premise, or his proposed conclusion. We have carefully examined the history of Senate Bill No. 243 (1987-1988 Reg. Sess.) (Senate Bill No. 243), which had adopted, in chapter 1485 of the Statutes of 1987, the "criminal conviction" requirement in former section 300(f). This history discloses that a purpose of Senate Bill No. 243, which made major revisions to the child dependency law, was to "[n]arrow[ ] the definition of abuse for purposes of

20

dependency proceedings.  The decision to remove a child from his or her home and/or terminate parental rights would be based on the immediate danger or threat of danger to the child.  Under current law, the definition of abuse is broader; it includes provisions regarding lack of parental control and is not focused solely on the immediate danger to the child." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 243 (1987-1988 Reg. Sess.) as amended May 26, 1987, p. 1; see Sen. Robert Presley, letter to Governor Deukmejian, Sept. 17, 1987, urging signature.)  But nothing in the legislative materials reveals the reason for imposing a "criminal conviction" requirement.[12] In particular, nothing indicates the Legislature thereby sought, by implication, to alter the commonly understood meaning of "neglect."

Former section 300(f) merely required the *existence* of a criminal conviction arising from the lethal "abuse or neglect" of a child.  Neither the language nor the history of this section reveals any care or concern by the Legislature about the specific offense for which the parent or guardian was

---

[12]     Two letters from interested parties to Senator Robert Presley, the sponsor of Senate Bill No. 243, urged that the "criminal conviction" requirement be eliminated.  The California Children's Lobby proposed that section 300(f) be amended to read, "[*t*]*here is reasonable cause to believe* the minor's parent or guardian has caused the death of another child through abuse or neglect." (Cal. Children's Lobby, letter to Sen. Presley, June 24, 1987, attachment E, unnumbered p. 5, italics added.)  Dr. David L. Chadwick argued that the need to wait for a criminal conviction before dependency proceedings could be initiated was not in the surviving children's best interest.  (David L. Chadwick, M.D., Amer. Academy of Pediatrics, letter to Sen. Presley, June 30, 1987, p. 2 [writing as chair of the Academy's district IX (Cal.) committee on child abuse].)  These suggestions were not adopted in the final version of Senate Bill No. 243 in 1987, but the available legislative history fails to disclose the reason for retaining the "criminal conviction" language.

convicted, or about the *elements* of such a conviction, including any heightened standard of negligence or "neglect" that might apply in the criminal proceeding.**13**

The effect of the 1996 amendment, on the other hand, was to "expand" the provision concerning a parent's or guardian's involvement in a child fatality "by *eliminating* the requirement of a conviction . . . and instead simply [to] provide[ ] *that the parent has caused the death of another child*." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended May 14, 1996, p. c, italics added.) In sum, there is no basis in section 300(f)'s history to conclude the Legislature ever specifically contemplated a special meaning of neglect, as used in the statute, such that a parent's or guardian's neglect resulting in the death of a child must have risen to the level of criminal negligence.

We have found no precedent for the proposition William advances. In *In re A.M.* (2010) 187 Cal.App.4th 1380, the case closest on point, the Court of Appeal found sufficient evidence to support a dependency finding under section 300(f). There, the father sought to quiet his newborn baby, who was sleeping between him and the baby's mother. The father pushed the child toward the mother, felt the baby turn on its side, heard sounds he knew indicated the child was struggling to breathe, but, after two minutes, went back to sleep. While the father was sleeping, the baby suffocated, and the father's efforts to resuscitate the child failed. The autopsy physician initially listed the death as " 'accidental,' " but later changed the listing to " 'undetermined.' " (*In re A.M.*, at p. 1385.) He indicated he was unable to opine whether there was negligence, because simply allowing a baby to lie

---

**13** Thus, for example, the "convict[ion]" requirement in former section 300(f) would certainly have been satisfied by a conviction of vehicular manslaughter of a child under Penal Code section 192, subdivision (c)(2), even though that offense specifically is committed "without gross negligence." (See pp. 19-20, *ante*.)

facedown is not generally sufficient to cause death, and he could not conclude that leaving the baby on its stomach for two minutes was reasonably likely to produce that result. (*Id*., at p. 1386.)

Nonetheless, the Court of Appeal noted that the father knew there was a risk to his infant child, had the ability to assess the risk, was in a position to intervene, and failed to do so even though he heard the baby struggling to breathe. The appellate court did not suggest the father's actions could, or did, amount to criminal negligence. It simply ruled that "[t]he evidence is sufficient to support the juvenile court's finding that [the father] caused the death of [the baby] through neglect." (*In re A.M.*, *supra*, 187 Cal.App.4th 1380, 1388.)

We are referred to a number of decisions that apply not section 300, but section 361.5. As noted above, this latter statute governs the juvenile court's authority to order the provision of reunification services, *after* it has adjudicated dependency and *after* it has found, on clear and convincing evidence, the need to remove the dependent child from the parent's or guardian's custody. Section 361.5 specifies that the court "need not" provide reunification services when, by clear and convincing evidence, it has found that the dependent child's parent or guardian "has caused the death of another child through abuse or neglect" (*id.*, subd. (b)(4)),[14] and may not do so in such a case unless it further finds, by clear and convincing evidence, that such services are in the dependent child's best interest (*id.*, subd. (c)). In each cited case, the Court of Appeal simply found, on the particular evidence, that the aggravated circumstances surrounding the parent's

---

[14]  The language of section 361.5, subdivision (b)(4), which parallels that of section 300(f), previously also required a criminal conviction for causing a child's death (see former section 361.5, subd. (b)(4), as added by Stats. 1987, ch. 1485, § 39, p. 5625), but was amended to its current language at the same time section 300(f) was so amended. (Stats. 1996, ch. 1083, § 2.7, p. 7528.)

23

or guardian's behavior leading to a child's death either supported the juvenile court's decision to deny or terminate reunification services, or demonstrated that the court's decision to grant such services was an abuse of discretion.

Thus, in *In re Alexis M.* (1997) 54 Cal.App.4th 848 (*Alexis M.*), the Court of Appeal dismissed a presumed father's appeal from a juvenile court's decision to terminate reunification services originally offered to him, when, at the 12-month review, the court found that reunification would be detrimental to the child. The Court of Appeal deemed the appeal, which was based on alleged technical deficiencies in the juvenile court's termination order, moot in light of the presumed father's intervening felony child abuse conviction arising from the death of the dependent child's sibling. As the Court of Appeal noted, the dependent child's removal from parental custody had been based on that lethal incident, which involved "very serious acts of abuse" — acts "too shocking to ignore" when the issue was whether the offending parent should receive reunification services. (*Id.*, at pp. 850-851.) Though the presumed father's subsequent felony conviction was not a factor in the juvenile court's decision to end reunification efforts, the Court of Appeal concluded, "it would have been, in the wake of the conviction, an abuse of the juvenile court's discretion to have *offered* [the presumed father] reunification services." (*Id.*, at p. 853.)

In *Patricio O. v. Superior Court* (1999) 69 Cal.App.4th 933, the Court of Appeal, upholding a denial of reunification services, cited evidence that the mother's children were victims of "battered child syndrome" at the hands of her former boyfriend (*id.*, at p. 936); that chronic, severe physical abuse had led to the death of one child, for which the boyfriend was convicted of murder; that although made aware the boyfriend was mistreating the children, the mother had failed to take action to protect them; that she remained in denial about the severity of the abuse and continued to think of the homicide as an accident; and that because of

24

her psychological makeup, she was likely to be involved in similar abusive relationships in the future. The Court of Appeal noted the juvenile court's comment that the evidence demonstrated the mother's " 'general reckless disregard for the welfare of the minors' " (*id.*, at p. 940), and further observed that the juvenile court had concluded the mother's "neglect rose to a level of criminal culpability" (*id.*, at p. 942), but also stressed that the juvenile court had considered all the reunification factors set forth in former subdivision (h) (now subd. (*i*)) of section 361.5 before deciding that reunification services should not be provided. (*Patricia O*., *supra*, at pp. 943-944.)

In *In re Ethan N*. (2004) 122 Cal.App.4th 55 (*Ethan N.*), the court relied heavily on *Alexis M*., *supra*, 54 Cal.App.4th 848, to conclude, under section 361.5, subdivisions (b)(4) and (c), that the evidence failed to support the juvenile court's decision to grant reunification services to a mother of dependent children removed from her custody. The evidence indicated that the mother's neglect of all her children, fueled by her methamphetamine habit, had allowed her husband to murder her infant son through chronic physical abuse culminating in asphyxia caused by a golf ball-sized wad of paper lodged in the baby's esophagus (a crime for which the husband had been sentenced to life without parole). The Court of Appeal acknowledged the mother's subsequent progress in drug rehabilitation, as stressed by the juvenile court. Nonetheless, the appellate court applied the strong presumption against reunification services when a parent's or guardian's abuse or neglect has caused another child's death. Though the Legislature has left open a " 'tiny crack' " for reunification in such a case, the Court of Appeal explained (*Ethan N.*, *supra*, at p. 65), a parent seeking reunification under such circumstances faces an "enormous hurdle," and the cases in which a parent will be able to justify reunification will be "rare." (*Id.*, at p. 68.) " 'The enormity of a death arising out of . . . child abuse,' " the Court of Appeal stated, " 'swallows up

25

almost all, if not all, competing concerns.' " (*Id.*, at pp. 68-69, quoting *Alexis M.*, *supra*, 54 Cal.App.4th 848, 853, fn. 5.)

Finally, in *Mardardo F. v. Superior Court* (2008) 164 Cal.App.4th 481, (*Mardardo F.*), the evidence indicated that the dependent child's father, when 15 years old, raped and murdered another child. He subsequently engaged in violent and sexually inappropriate behavior while confined in the former California Youth Authority (CYA), failed to complete a sex offender program while in CYA, was identified as a continuing threat to society with an antisocial personality disorder at the time of his dishonorable discharge from CYA at age 25, and had since sustained convictions for failing to register as a sex offender and for an episode of domestic violence. (*Id.*, at p. 492.) Under these circumstance, the Court of Appeal concluded, the juvenile court's denial of reunification services was amply supported.[15]

Pointing to the aggravated facts of the cases described above, and the opinions' various descriptions of the parents' abuse or neglect therein as "very serious," "too shocking to ignore," " 'reckless,' " "criminal," and "culpab[le]," William insists these decisions stand for the proposition that the strong

---

[15] In *Mardardo F.*, the father alternatively contended that section 361.5, subdivision (b)(4), by referring to a child fatality caused by the parent or guardian "*of the* [*dependent*] *child*" (italics added), required the death to have occurred *while* he was such a parent, and thus could not apply to the rape murder he committed at age 15, before he was a parent. Otherwise, he suggested, section 361.5, subdivision (b)(4) would extend to a parent whose long-past childhood or adolescent carelessness had caused another child's death. Responding to this assertion, the Court of Appeal stated that section 361.5, subdivision (b)(4) requires "culpability, a concept that applies to [the] [f]ather," and "does not concern mere tragic horseplay among children." (*Mardardo F.*, *supra*, 164 Cal.App.4th 481, 487-488.) But nothing in this statement implies that the requisite culpability cannot be satisfied by an *adult's* breach of ordinary care leading to the death of a child.

presumption against reunification services when the parent or guardian "has caused the death of another child through abuse or neglect" (§ 361.5, subd. (b)(4)), applies *only* to a criminal level of lethal negligence. Hence, he urges, we must apply the same standard to the parallel language in section 300(f), the statute governing the initial adjudication of dependency.

We disagree. Contrary to the inferences William seeks to draw, we find no implication in these decisions that criminal negligence is required under either statute. They merely concluded, in particular aggravated circumstances, that it was necessary, or proper, to apply the statutory presumption against reunification against a parent or guardian whose abuse or neglect had caused another child's death. Nothing in the reasoning or results of these cases suggests that *only* criminal negligence leading to a child fatality will allow a dependency finding under section 300(f), or trigger the presumption against reunification set forth in section 361.5, subdivisions (b)(4) and (c).

On the contrary, it is " '[t]he enormity of a *death*' " of a child arising from parental inadequacy that invokes the provisions of sections 300 and 361.5. (*Ethan N.*, *supra*, 122 Cal.App.4th 55, 68, quoting *Alexis M.*, *supra*, 54 Cal.App.4th 848, 853, fn. 5, italics added.) The Legislature has clearly provided that when one's abuse or neglect has had this tragic consequence, there is a proper basis for a finding that his or her surviving child may be made a dependent of the juvenile court, and that, if the circumstances then also justify the child's removal from the parent's or guardian's physical custody, a presumption against reunification should arise.

On the other hand, a finding of dependency based on section 300(f) does not automatically lead to the denial of reunification services under section 361.5. This case illustrates the point. With the Department's approval, the juvenile court granted such services to William, implicitly finding that, under all the

27

circumstances applicable here, efforts to reunify him with Ethan and Jesus, and to restore his full parental rights, *were* in the children's best interest.[16]

William urges that an interpretation of section 300(f) to include mere ordinary negligence causing a child's death may produce collateral estoppel problems when the same fatality gives rise to both dependency proceedings and criminal prosecution. As he notes, collateral estoppel issues were raised as concerns about the 1996 amendment to section 300(f), which eliminated the need for a criminal conviction as a *prerequisite* to dependency proceedings based on another child's death. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2679 (1995-1996 Reg. Sess.) as amended May 14, 1996, p. *o* ["Care must be taken that the juvenile court action does not create a bar (collateral estoppel) as to any issues of fact.]".) However, the Legislature passed the 1996 amendments anyway. Even under William's interpretation, these amendments reduced the *standard of proof* of lethal abuse or neglect in a dependency case, and thus created a potential bar to

_____

[16] Focusing on section 361.5, the "reunification bypass" provision, amici curiae D'Andrade and Berrick suggest that unless subdivision (b)(4) of section 361.5 (and thus section 300(f)) is limited to criminal abuse or neglect leading to the death of a child, the state risks losing federal funds for foster care and adoption assistance under the Adoption and Safe Families Act of 1997 (ASFA) (Pub.L. 105-89, 42 U.S.C. § 670 et seq.). The ASFA generally requires a state to make reasonable efforts to reunify a family. (42 U.S.C. § 671(a)(15)(B).) However, as the Department observes, such reasonable efforts are not required when a court has found that the parent or guardian has subjected a child to "aggravated circumstances (*as defined in State law*, which definition may include *but need not be limited to* abandonment, torture, chronic abuse, and sexual abuse)." (*Id.*, § 671(a)(15)(D)(i), italics added). Amici curiae fail to demonstrate that the state has contravened ASFA standards by providing, in plain terms, that reunification efforts must be denied when the juvenile court finds, by clear and convincing evidence, that a want of due care by the parent or guardian of a dependent child caused another child to die, unless the court then determines, with similar certainty, that reunification is in the dependent child's best interest.

criminal prosecution if an antecedent dependency proceeding resulted in a finding that criminal negligence had not been established by even a preponderance of evidence. (See *In re Nathaniel P.* (1989) 211 Cal.App.3d 660, 670; *Lockwood v. Superior Court* (1984) 160 Cal.App.3d 667, 672; but see *People v. Percifull* (1992) 9 Cal.App.4th 1457, 1459; cf., *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 347.) No additional potential interference with criminal prosecution arises from a dependency determination that even mere *ordinary* negligence was not established by a preponderance of evidence. A fortiori, such a conclusion would mean that criminal negligence could also not have been shown by that standard.

Conversely, an antecedent criminal finding, beyond reasonable doubt, that the parent or guardian was guilty of criminal culpability in a child's death would require that a dependency allegation under section 300(f) be sustained, regardless of whether the dependency standard was criminal, or mere civil, negligence. (See *People v. Sims* (1982) 32 Cal.3d 468, 482; *Teitelbaum Furs, Inc. v. Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 603-606; *20th Century Ins. Co. v. Schurtz* (2001) 92 Cal.App.4th 1188, 1192.) Thus, William fails to persuade us that collateral estoppel considerations influenced the Legislature, contrary to the plain words of section 300(f), to require criminal negligence before a parent's or guardian's neglect that caused the death of another child can lead to a dependency adjudication.

William cites *In re J.N.* (2010) 181 Cal.App.4th 1010, which held that a dependency allegation under subdivision (*b*) of section 300 ("[a] child has suffered, or there is a substantial risk that the child will suffer, serious physical harm . . . as a result of" the parent's or guardian's failure "to adequately supervise or protect the child") requires a finding of current risk, and thus cannot be based on a single episode of parental misjudgment, even when a child was thereby injured. (*In re J.N.*, at pp. 1022-1025, disagreeing with contrary suggestions in

29

*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435.)[17] But whatever the merits of that conclusion, it does not apply to section 300(f) so as to require criminal negligence, or otherwise bar a dependency finding, where a single episode of carelessness resulted in a child *fatality*. By its plain terms, section 300(f) applies whenever a parent's or guardian's "abuse or neglect" caused the death of "another child." This phrase is singular, not plural, and it leaves no room for a conclusion that multiple instances of lethal carelessness are required.

William urges that applying a mere civil negligence standard to section 300(f) would lead to absurd results. He posits the examples of homeowning parents who fail to maintain the fence around their swimming pool, thus allowing a neighbor child to enter and drown in the pool, or a parent momentarily distracted by a cell phone conversation who, while driving, negligently strikes and kills a child who darts into the street.[18]

But there is no absurdity in the plain language of section 300(f). As we discuss in further detail below, the Legislature could rationally conclude that when a parent's or guardian's negligence has led to the tragedy of a child's *death*, the

---

[17] In *In re J.N.*, *supra*, 181 Cal.App.4th 1010, the evidence indicated that the family went to a restaurant for dinner, where the parents drank over their limit and became intoxicated. On the way home, the father crashed the family's van into a light pole, injuring two of the couple's children, including a 14-month-old toddler who was not properly secured in a child safety seat. When police officers arrived, they saw the mother holding a young child who was bleeding. The mother ignored an officer's advice to apply pressure to the child's wound, refused to hand the child to the officer when asked to do so, and behaved in a belligerent manner toward another woman at the scene. (*Id.*, at pp. 1016-1017.) The evidence indicated that the children were otherwise healthy, loved, and well cared for.

[18] As William observes, section 300(f) merely refers to the death of "another child," and does not specify that the deceased child necessarily must have any family or custodial connection to the "parent or guardian" who caused the death.

dependency court should have the power to intervene for the safety and protection of children remaining in the parent's or guardian's custody, even if the parent's lethal carelessness cannot necessarily be characterized as sufficiently "gross," reckless, or culpable to be labeled "criminal." Indeed, the very purpose of the 1996 amendment was to promote the child-protective purposes of the juvenile dependency scheme by allowing such intervention, in the case of a child fatality, *without* the necessity of a criminal conviction.

The dependency scheme in general, and section 300(f) in particular, leaves ample room for discretionary treatment that allows for the equities of particular situations. Informal investigation may confirm that no intervention by social service agencies is necessary in a particular case. Or, as initially occurred here, parents may be offered voluntary services without judicial intervention. Even where a dependency petition is filed, and its allegations are sustained, the court is not thereby *required* to declare dependency, or to remove children from the parent's or guardian's custody, or to deny reunification services. (See discussion, *ante*.)[19]

---

[19] Thus, we are not persuaded to depart from the plain language of section 300(f), and to impose a "criminal negligence" standard the Legislature did not include, by insistent arguments that the parallel provision of section 361.5, subdivision (b)(4), applying a presumption against reunification services, otherwise "casts too wide a net." We are told that because section 361.5 virtually guarantees no reunification will occur when the presumption applies, subdivision (b)(4) of section 361.5, and by parity of construction section 300(f), should be reserved for the most culpable cases of parental "abuse or neglect" causing a child's death. For the reasons set forth above, we are convinced that the statutory scheme, as written, does not unfairly preclude reunification in appropriate cases where a parent or guardian has "caused the death of another child through abuse or neglect." In any event, of course, these concerns are most appropriately addressed to the Legislature.

Under these circumstances, no inherent unfairness arises from applying the plain words of section 300(f). Thus, the issues raised by William fail to demonstrate that we should depart from them. Accordingly, we conclude that, for purposes of a dependency adjudication under section 300(f), the neglect by which a parent or guardian "caused the death of another child" may include the parent's or guardian's breach of ordinary care, and need not amount to criminal negligence.

There can be no doubt that William's failure to secure his 18-month-old daughter in a child safety seat before driving her in a vehicle — a direct violation of statute (Veh. Code, §§ 27360, subd. (a), 27360.6) — constituted, at a minimum, a breach of ordinary care, and William does not argue otherwise. Hence, the dependency findings based upon section 300(f) do not fail on grounds that he failed to meet the statutory standard of "abuse or neglect."

**3. Does section 300(f) require independent evidence of a current risk of harm to living children in the parent's or guardian's care?**

William next urges, as did the Court of Appeal dissent, that a dependency finding under section 300(f) requires specific evidence of a nexus between the particular circumstances of the child fatality caused by the parent or guardian and a substantial *current risk* of harm to living children in that person's custody and care. Again, we disagree.

William points to section 300.2's statement that the purpose of the dependency statutes "is to provide maximum safety and protection for children who are *currently* being . . . abused, . . . neglected, . . . or . . . exploited, and to ensure the safety, protection, and . . . well-being of children who are *at risk* of that harm." (Italics added.) He also notes that many other subdivisions of section 300 stress *actual* harm to a child, or a "substantial risk" that such a child will suffer harm, as a prerequisite to the child's eligibility for dependency. (E.g., *id.*, subds. (a) [child "has suffered," or is at "substantial risk" of suffering, serious

32

physical harm inflicted nonaccidentally by parent or guardian], (b) [child "has suffered," or is at "substantial risk" of suffering, serious physical harm due to inadequate care or protection by parent or guardian], (c) [child "is suffering," or is at "substantial risk" of suffering, serious emotional damage as a result of parent's or guardian's conduct], (d) [child "has been sexually abused," or is at "substantial risk" of suffering sexual abuse from household member, or as a result of parent's or guardian's inadequate protection], (j) [child is at "substantial risk" of harm as evidenced by parent's or guardian's abuse or neglect of child's sibling; juvenile court must consider whether risk to child is demonstrated by particular circumstances of sibling abuse or neglect].)

But the examples William cites undermine, rather than support, his argument. These examples demonstrate that the Legislature understands how to specify the need for particularized evidence that a child is currently suffering or at risk of harm when it intends to include such a requirement. Yet section 300(f) contains no such language. It simply provides that a minor in the parent's or guardian's care and custody may be adjudged a dependent child if the parent or guardian "caused the death of another child through abuse or neglect."

When language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful. (E.g., *People v. Giordano* (2007) 42 Cal.4th 644, 670; *In re Jose A.* (1992) 5 Cal.App.4th 697, 701-702.) We must thus reasonably infer that the Legislature did not intend to include a separate "current risk" requirement in section 300(f). (*In re A.M.*, *supra*, 187 Cal.App.4th 1380, 1389 [directly so holding].)

The reason for such an omission seems both reasonably clear and fully consistent with the statutory purpose. The Legislature apparently concluded that a parent's or guardian's neglectful or abusive responsibility for a *child fatality* may

33

*inherently* give rise to a serious concern for the current safety and welfare of living children under the parent's or guardian's care, and may thereby justify the juvenile court's intervention on their behalf without the need for separate evidence or findings about the current risk of such harm.

William again suggests this interpretation leads to absurd results, because it allows application of section 300(f) as a basis for juvenile court intervention even when the circumstances under which one caused a child fatality are entirely divorced from his or her current performance as a parent or guardian. William advances the example of a responsible and caring mother whose treatment of her children is exemplary, but who, long ago as a teenage driver, caused a traffic accident in which a child was killed.

But the theoretical application of a statute's plain language to hypothetical extreme cases does not demonstrate that these literal words are absurd, and should therefore be disregarded or judicially modified to include a requirement the Legislature saw fit not to impose. (See, e.g., *People v. Washington* (1996) 50 Cal.App.4th 568, 578.) There is no reason to suppose that section 300(f) would be employed in the arbitrary manner William posits. Certainly it was not so applied in this case. William, aware that he should do so, nonetheless failed to secure his 18-month-old daughter in a child safety seat before transporting her in a vehicle. She died as a result. Even if her arm injury warranted medical attention, there is no evidence of a threat to life or limb so serious that the need for immediate medical help reasonably outweighed the risk of injury or death that could well —and in this case did — befall an unrestrained child in a traffic accident.

William's fatal misjudgment was thus directly relevant to his ability and willingness to ensure the safety and well-being of Valerie's young siblings, Ethan and Jesus, who were then also in his care. The juvenile court evidenced its belief

34

that this was so by sustaining allegation j-1 of the dependency petition, which asserted that William's fatal abuse or neglect of Valerie demonstrated a danger of serious harm to Ethan and Jesus. (See § 300, subd. (j).) The court's finding to this effect appears amply supported.

Accordingly, we reject William's contentions that section 300(f) expressly requires, or, in any event, that the evidence in this case fails to show, a current risk of harm to Ethan and Jesus arising from his responsibility, through abuse or neglect, for Valerie's death.

**4. What does section 300(f) mean by "caused?"**

As noted above, we asked the parties to address the meaning of the word "caused," as used in section 300(f) (parent or guardian "*caused* the death of another child through abuse or neglect" (italics added)). Having examined the issue, we find no indication that the word "caused," which has a commonly understood meaning in both criminal and civil law, was used in a special or different sense in section 300(f). We further reject William's contention that his failure to secure Valerie in a child safety seat was not a "cause[ ]" of her death for purposes of section 300(f).

One's wrongful acts or omissions are a legal cause of injury if they were a substantial factor in bringing it about. (*People v. Jennings* (2010) 50 Cal.4th 616, 643; *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205; *People v. Sanchez* (2001) 26 Cal.4th 834, 847 (*Sanchez*); *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968-969; *Mitchell v. Gonzalez* (1991) 54 Cal.3d 1041, 1048-1054.) If the actor's wrongful conduct operated concurrently with other contemporaneous forces to produce the harm, it is a substantial factor, and thus a legal cause, if the injury, or its full extent, would not have occurred but for that conduct. Conversely, if the injury would have occurred even if the actor had not acted wrongfully, his or her conduct generally cannot be deemed a substantial

35

factor in the harm. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1243-1244; Rest.2d Torts, § 432(1).) This "but for" limitation does not apply, however, if the actor's wrongful conduct alone would have produced the harm, even without contribution by other forces. (*Viner*, *supra*, at p. 1240; Rest.2d Torts, § 432(2).)

Nothing in the plain language, or the history, of section 300(f) suggests the Legislature had a more restrictive concept of "cause[ ]" in mind for purposes of that statute. Indeed, a recent Court of Appeal decision has concluded that the normal principles of "substantial factor" causation apply to section 300(f). (*In re A.M.*, *supra*, 187 Cal.App.4th 1380, 1388.) We find no reason to disagree.

William nonetheless insists that the fatal accident, produced entirely by the other driver's negligence, was the sole legal cause of Valerie's death, and that, as a matter of law — or at least on this record — his antecedent failure to secure her in a child safety seat cannot be deemed a substantial factor in the fatality. For this conclusion, he appears to advance two theories. We reject both.

First, William urges that the evidence is insufficient to show Valerie would not have died if she had been properly restrained. Analogizing to the "seat belt defense" recognized in tort law (e.g., *Housley v. Godinez* (1992) 4 Cal.App.4th 737, 743), and noting the severity of the fatal collision, he urges it was the Department's burden to show that Valerie would have survived if restrained in a child safety seat, and that his negligence in this regard was thus a substantial factor contributing to her death.

We need not linger on the question of how, or whether, a version of the "seat belt defense" — which invokes principles of contributory and comparative negligence for the purpose of establishing liability and monetary damages as among an injured plaintiff and one or more tortfeasors — should apply under the child protective purposes of section 300(f). In the juvenile court, William waived any right to benefit from such a doctrine. Aware of the allegation that he caused

36

Valerie's death by failing to restrain her in a child safety seat, William *submitted the matter on the Department's reports*, which concluded that this failure *was* such a cause. And, while William's counsel argued that, contrary to these reports, Valerie was not thrown from William's vehicle in the collision, counsel acknowledged, "it is true, as alleged, that [Valerie] died . . . as a result of not being strapped in a safety seat." [20] William cannot now urge that the juvenile court erred by so finding.

Equally unavailing is any suggestion that William is protected by the doctrine of intervening or superseding cause. "[T]he term 'superseding cause' means 'an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible.' " (*Sanchez, supra*, 26 Cal.4th 834, 855, quoting *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9.) But application of this doctrine "depends on whether [one's] conduct ' "was within the scope of the reasons imposing the duty upon the actor to refrain from negligent conduct. If the duty is designed, in part at least, to protect the [victim] from the hazard of being harmed by the intervening force . . . then that hazard is within the duty, and the intervening force is not a superseding cause.' " (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1016-1017, quoting *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 725; see also *Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 769-770.)

---

**20** At oral argument, William's appellate counsel, Christopher Blake, disputed that William's trial counsel, Morgan Spector, made such a concession, but appellate counsel is simply wrong in this regard.

There can be no question that the duty, mandated by statute, to secure a young child in a safety seat before transporting the child in a vehicle is intended to guard against the child's injury or death in *any* ensuing traffic accident, not just one in which the child's driver was at fault. This is precisely the risk that materialized here. As a matter of law, the collision in which Valerie was killed cannot be deemed a superseding cause of her death that absolves William from his negligence in failing to secure her in a child safety seat.

## CONCLUSION

The judgment of the Court of Appeal is affirmed.


BAXTER, J.


**WE CONCUR:**

CANTIL-SAKAUYE, C. J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Ethan C.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 188 Cal.App.4th 992
**Rehearing Granted**

_____

**Opinion No.** S187587
**Date Filed:** July 5, 2012
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Sherri S. Sobel, Juvenile Court Referee

_____

**Counsel:**

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, Judith A. Luby and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Appellant.

Jennifer Henning; Thomas E. Montgomery, County Counsel (San Diego), John E. Philips, Chief Deputy County Counsel, and Tahra C. Broderson, Deputy County Counsel, for California State Associate of Counties as Amicus Curiae on behalf of Plaintiff and Appellant.

Christopher Blake, under appointment by the Supreme Court, for Defendant and Appellant.

William Wesley Patton as Amicus Curiae on behalf of Defendant and Appellant.

Ronald L. Brown, Public Defender (Los Angeles), Albert J. Menaster and Karen Nash, Deputy Public Defenders, as Amici Curiae on behalf of Minor.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kim Nemoy
Principal Deputy County Counsel
201 Centre Plaza Drive, Suite 1
Monterey Park, CA  91754-2142
(323) 526-6189

Tahra Broderson
Deputy County Counsel
4955 Mercury Street
San Diego, CA  92111-1703
(858) 492-2500

Christopher Blake
4455 Lamont Street, #B
San Diego, CA  92109
(858) 274-1772