Filed 5/26/21  In re R.T. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.T. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, Plaintiff and Respondent, v. J.T., Defendant and Appellant. | F081935 (Super. Ct. Nos. JVDP-20-000169, JVDP-20-000170, JVDP-20-000171) **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Gloria F. Rhynes, Judge.  (Retired Judge of the Alameda Sup. Ct. assigned by the Chief Justice pursuant to article VI, § 6 of the Cal. Const.)

Alexis C. Collentine, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Angela J. Cobb, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

J.T. (mother), appeals from juvenile court orders that declared her three children dependents and removed them from her custody. We reject mother's contention that there was insufficient evidence to support those orders and therefore affirm.

**FACTUAL AND PROCEDURAL HISTORY**

*Referral*

On July 21, 2020, the Stanislaus County Community Services Agency (agency) received a referral from two mandatory reporting parties that a two-month-old infant had been transported to the local hospital, where he was pronounced dead. It was suspected that the infant had been smothered, although the investigation was ongoing. At the time of the incident, Justin T. (father) was at the residence with their three older children; mother was on her way from "somewhere north," in the Sacramento/Groveland area where she worked. The home was described as having beer cans stacked in the room where the infant was, which needed to be moved to gain access to the child. The home had a distinct marijuana smell.

Father told a social worker he was lying on the pullout couch while the infant, Liam T., fell asleep on his chest. When father got tired, he laid Liam T. down on his back on the other side, close to the middle of the bed. Father could not say why Liam T. was not placed in the bassinette, which was next to the couch. Father reported that he was woken by his daughter, R.T., age six, to find his son, Elias T., age two, sleeping on top of the infant with Liam T.'s face down. When father noticed that Liam T. was not breathing, he began CPR and called 911.[1] Father claimed not to be under the influence of alcohol or marijuana at the time, and that he last used marijuana two weeks prior. After testing positive for marijuana, father then acknowledged using the drug one week prior.

Father confirmed that mother was not home during the incident. He also acknowledged that he and mother had a previous child dependency case in San

---

[1] Another son, N.T., age four, also lived with mother and father.

2.

Bernardino County, in which their then three children were removed from their care, but that they later completed the case plan and the dependency was closed. In that dependency case, father and mother were charged with child cruelty and failure to provide, but father claimed the charges were later dropped.

Mother was interviewed and stated she was not home the previous night as she had stayed at her manager's home at an RV resort in Groveland where she worked, as it had been too late for her to return home. According to mother, this was the first time she had been away from home since Liam T. was born, and that he usually slept in the bassinette. Mother stated that father wanted to end their relationship the week before, but they were still living in the same home. She denied domestic violence or arguing in front of the children. Mother arranged for her children to stay with maternal grandmother and a safety plan was signed.

R.T. was interviewed and stated that she woke up during the night and went to sleep in the bed with her father and Elias T., but did not know where Liam T. was at the time. She reported that mother and father often argue and that they were going to split. R.T. described getting spanked with an open hand or fly swatter and yelled at when she gets into trouble.

The 911 call made by father stated that he had been woken up 10 to 15 minutes earlier and found Elias T. on top of Liam T. Father reported that he had Liam T. on his lap, and he was bleeding from his nose. Father said he was performing CPR on Liam T.

A paternal aunt, who is the landlord for the family and lives on the same property, described Liam T. as healthy with no concerns. He was too young to roll from his back to his stomach. She was made aware of what was happening at the time of the incident and saw father on the phone with 911 and said he was doing CPR. She denied seeing any beer cans or smelling marijuana. Maternal grandmother also denied seeing any beer cans or smelling marijuana in the house.

3.

As of July 27, 2020, the autopsy was not yet completed.  No foul play was suspected, but the coroner was still awaiting toxicology and histology results.

In a subsequent interview with mother, she described Liam T. as a healthy baby and confirmed that he was too young to roll from back to belly or visa versa.  She stated this was the first time she had been away from Liam T. for a night, and she stated that this was the first time father had been present for any of the children during their infancy.  She did not believe father understood the dangers of co-sleeping.  Mother had not spoken to father about Liam T.'s routine before that night as the two of them did not always see eye to eye and she did not want to tell him what to do.  Mother said she had not spoken to father about what happened and did not intend to, as she did not want to know.  Mother was told by the social worker that it was important for her to know so she could protect her other children.  Mother did not think father would intentionally hurt any of the children; she denied having beer cans in the house and she did not know how often father smoked marijuana.

Mother reported that she and father were going through a separation, which was not mutual.  The two argued about keeping the house clean and "other relationship stressors."  She admitted that she once found an empty Tylenol bottle in the children's room after they were left alone with father, but after taking them to the hospital, it was determined that they did not ingest any.  Mother described father as not helpful or involved in the children's lives prior to their previous dependency case.

Father was again interviewed and stated that he was a certified first responder and volunteer firefighter.  His last CPR class was in 2013.  He first stated that this was not the first time he had been left alone with Liam T. but recanted after being informed that others contradicted this.  He again described the events that led to him discovering Liam T. face down in a pillow with Elias T. on top of him.  When he discovered him, he still felt warm, but had no pulse.  He then started doing CPR.

Father stated that neither he nor mother ever co-slept with Liam T. before and usually placed him in the bassinette. He knew co-sleeping could be dangerous. He admitted using marijuana the week prior, but never smoked around the children.

Father confirmed that he and mother planned to separate, which was initially a mutual decision but eventually he wanted it more than she did. He referred to "certain things" he "could not handle" about mother but gave no details.

Maternal grandmother subsequently reported that she had heard inconsistencies as to why mother had not returned home the night of the incident, and that it may have involved an argument between mother and father.

Prior child welfare history revealed a substantiated general neglect allegation from March of 2019, which described Elias T. as smelling of urine most of the time and not having been to the doctor since he was born. The reporting party stated that the children visited her daily and were always hungry. R.T. had a urinary tract infection which the reporting party took her to the doctor for, but it was not certain that the infection had cleared. The children's room was very dirty, with toys and food items. The reporting party had taken R.T. and sibling N.T., to the hospital because they had gotten into a bottle of ibuprofen; a pill was also found in Elias T.'s crib. At the time, father was working at night and did not help with the children. Mother was in rehabilitation for taking opiates in 2017 and father was considered the enabler; mother was also said to have untreated mental illness. A dependency petition was filed and sustained, alleging mother had a history of placing Elias T., then not a year old, at risk of harm because he was found unsupervised in a rear bedroom while father was sleeping in the living room after working the night shift. Mother knew this was happening. There were two incidents of the children being taken to the hospital for possibly ingesting medication while under father's care. The family received family maintenance services and the case was closed at the end of October 2019.

A criminal history report indicated that both mother and father had been charged in March 2019 with child cruelty with possible injury or death and failure to provide. Mother and father pled to the latter charge and were sentenced to three years' probation.

*Section 300 Petition*

A Welfare and Institutions Code section 300[2] petition was filed which contained allegations pursuant to subdivision (b) surrounding Liam T.'s death. It further alleged an unsafe and unsanitary home. As to mother, it was alleged that she left father alone with Liam T., despite concerns from the earlier Child Protective Services (CPS) case. The three older children were placed with maternal grandmother.

*Detention*

At the August 26, 2020, detention hearing, the children were detained and a jurisdiction and disposition hearing set for September 21, 2020.

*First Amended Section 300 Petition*

A first amended petition was filed August 31, 2020, which added allegations under section 300, subdivision (f) (caused another child's death through abuse or neglect) and (j) (abuse of a sibling), and specifically, as to mother, that she "left the father alone in the care of the minors despite concerns from the CPS case in 2019 where their children were removed under his care due to his neglect."

*Scheduled Hearing*

On September 21, 2020, the juvenile court ordered hair follicle tests for the minors and continued the matter to October 22, 2020. The autopsy report for Liam T. was not yet complete.

---

**2**     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

*Jurisdiction and Disposition Report*

The jurisdiction/disposition report prepared by the agency recommended that the children be removed from mother and father's care, and that both parents receive reunification services.

Mother's social history included details of her earlier life, that she was a certified medical assistant who was currently working at an RV resort, that she and father had known each other since high school; that she had been diagnosed with PTSD, depression and anxiety; that she takes Zofran and saw a therapist while in San Bernardino County; she smoked marijuana only twice and last took CBD a few months prior. In addition to Liam T. and her three other children, she had another child who passed away a day after his birth in 2013. Mother described father as her support system.

Father did not make himself available for a social history.

All three children were reported to be physically healthy, although they qualified for mental health services. The two boys were referred to an audiologist and to be assessed for speech or developmental delays.

On October 5, 2020, mother reported that she had separated from father and moved her belongings out of the residence. Mother explained that she did so because father was not engaged with his services or with the agency, but she did not have other complaints about him. The agency expressed concern that mother did not really see any safety concerns with father. The agency was not certain whether mother's separation from father was permanent or only until father began to engage in services. Mother had gone back and forth as to whether she wanted visits with the children to include father or not. At the moment, she was asking that they be together.

Mother was engaged in services. She had completed a substance use disorder assessment and there were no recommendations for treatment. She had completed an intake at Sierra Vista and was assigned a clinician for counseling. Father had more recently attended an intake at Sierra Vista and also been assigned a clinician.

7.

A team meeting was held via telephone on October 5, 2020. Father did not participate.

The agency reported it was concerned that the family had a previous case in which lack of supervision of the children by father led to two visits to the hospital for possible ingestion of medication. The current case involved lack of supervision that lead to Liam T.'s death. The agency was also concerned that mother had incorrectly told the current caregiver that the agency had agreed that she would receive family maintenance services if she divorced father.

The autopsy was still not complete, but the coroner verbally reported that the finding was "unsafe sleeping conditions."

The agency recommended that the children be removed from mother and father's custody, that both receive reunification services, and that a hearing be set in 90 days to determine if family maintenance services would be appropriate.

Case notes reported that maternal grandmother had earlier reported that mother "can be unbalanced at times" and that father was "usually the more put-together parent." She reported that mother "cries and freaks out" under pressure and father is a "loving follower" and a "quiet storm."

In August, the social worker had learned from mother's eligibility worker that, three days prior to the incident in July 2020, mother reported that she and father were no longer in a relationship and he was not helping financially. Mother wanted father removed from her public assistance case. Maternal grandmother reported that she could not keep up with the state of mother and father's relationship.

Mother had also spoken to the social worker and stated that she did not know why she was being investigated as this "isn't my problem." According to mother, she left father because she believed that, since she was not present when Liam T. died, she would get the children back if she separated from father. Told this was not necessarily so, mother now worried she "left her husband for no reason."

8.

At a visit with maternal grandmother in September of 2020, maternal grandmother reported that mother told her that, according to CPS, maternal grandmother had to adopt Elias T., or the other two children would be taken away permanently. Maternal grandmother expressed concern for her grandchildren and mother's state of mind.

Visits, half in person and half through Zoom, went well.

When asked where she might live if the children were returned to her, mother told the social worker she would move into maternal grandmother's house. A few days later, maternal grandmother's partner told the social worker that mother had recently told them that, if she divorced father, the agency would drop the case and mother would then need to move into maternal grandmother's home. When told this was not true, they stated that they felt like mother was manipulating them.

The jurisdiction/disposition report from the earlier San Bernardino case was attached to the agency's report and in it mother admitted to using ecstasy once and marijuana occasionally. Mother reported having had mental health treatment. She reported physical, emotional and sexual abuse by her stepfather from age five until 18. As part of their sentence in the earlier criminal case, mother and father were required to complete a 52-week child abuse prevention class.

*Jurisdiction and Disposition*

At the October 22, 2020 hearing, the agency reported that it had just received the coroner's report. The agency asked that drug assessment and testing be deleted from mother's case and added to father's case plan. The matter was continued to October 26, 2020.

At the hearing on October 26, 2020 a discussion was had as to whether the matter should remain in Stanislaus County as both parents were now living in Tuolumne County, but engaged in services in Stanislaus County. There was a concern that, if the case was transferred, there would be a delay due to Covid-19.

9.

Counsel for mother asked that the agency assess whether relative supervision for visitation was appropriate, as the current care providers were not willing to supervise. The agency was given discretion to modify the place and manner of visitation if appropriate.

No further argument was made by counsel and the juvenile court found the allegations of the petition true. It declared the children dependents of the juvenile court and adopted the proposed findings and orders. The juvenile court found by clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if they were returned home. The juvenile court found mother's progress "fair" and father's "limited," and removed the children from mother and father's custody.

## DISCUSSION

### I.  JURISDICTIONAL FINDINGS

Mother challenges the sufficiency of the jurisdictional findings as to her conduct only—she makes no challenge to the jurisdictional findings against father. The agency argues that because the issues raised in mother's appeal have no effect on the juvenile court's assumption of dependency jurisdiction, mother's appeal is not justiciable because it will have no practical impact. We will address mother's argument on the merits but affirm.

Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only. As a result, we need not consider jurisdictional findings based on the other parent's conduct. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491–1492.) "The general rule is that 'the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition.' " (*In re M.R.* (2017) 7 Cal.App.5th 886, 896.) "The juvenile court's various jurisdictional findings with respect to [father] are not challenged in this appeal and are independently sufficient

to justify the juvenile court's exercise of jurisdiction over [the children]." (*Ibid.*) It is nevertheless appropriate "to reach the merits of the other parent's jurisdictional challenge in three situations: (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.) We therefore address the merits of mother's challenge to the jurisdictional findings against her, because those findings serve as the basis of the dispositional order that she also challenges.

The section 300 petitions alleged allegations against mother under subdivisions (b), (f), and (j). The section 300, subdivision (b) allegation allows the juvenile court to assume dependency jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of his or her parent … to supervise or protect the child adequately … by the willful or negligent failure of the parent … to provide the child with adequate food, clothing, shelter, or medical treatment ...." As to mother, the section 300, subdivision (b) allegation alleged mother was not present at the time of Liam T.'s death; that the children had been previously removed from her care due to her failure to adequately care for the children; that mother had a previous criminal history for misdemeanor failure to provide (Pen. Code, § 270); that the home was unsafe and unsanitary; and that mother left the children alone with father despite previous concerns wherein the children were removed under his care due to his neglect.

The section 300, subdivision (f) allegation alleges that the child's parent caused the death of another child through abuse or neglect. As to mother, the petition alleged similar allegations as those alleged in the section 300, subdivision (b) allegations, with the additional information that mother was not home on both occasions during the

11.

previous dependency case when the children were left with father and then needed to be taken to the hospital for possibly ingesting medication.

The section 300, subdivision (j) allegation alleges that a child's sibling has been abused or neglected, as defined in section 300, subdivision (b), and there is substantial risk that the child will be abused or neglected. As to mother, the petition alleged similar allegations as those in section 300, subdivisions (b) and (f).

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.) The appellant bears "the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

We first address the section 300, subdivision (f) allegation, as mother argues that allegation could have consequences in the future. Again, a child comes within the jurisdiction of the juvenile court under section 300, subdivision (f), when the court finds "[t]he child's parent or guardian caused the death of another child through abuse or neglect." As for the standard of negligence under subdivision (f), our Supreme Court has established that the statute "allows (but does not require) the juvenile court to adjudge a child a dependent if the court finds that the want of ordinary care by the child's parent or guardian caused another child's death." (*In re Ethan C.* (2012) 54 Cal.4th 610, 618.)

In addition to the usual standard of negligence in tort, "normal concepts of legal causation apply under section 300 (f)." (*In re Ethan C., supra,* 54 Cal.4th at p. 618.) "Section 300, subdivision (f), requires a causal connection between the parent's acts or omissions and a child's death. A cause is defined as '[s]omething that produces an effect

12.

or result.' (Black's Law Dict. (9th ed. 2009) p. 250, col. 1.) Under both criminal and civil standards, a causal connection occurs when the acts of an individual are a substantial factor contributing to a death or injury. (See *People v. Caldwell* (1984) 36 Cal.3d 210, 220; see also *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968–969.)" (*In re A.M.* (2010) 187 Cal.App.4th 1380, 1388.)

The factual allegation alleged under this section related primarily to father's conduct in placing Liam T. to sleep in the bed with him, resulting in Liam T. suffocating when Elias T. crawled into bed with father and Liam T. sometime during the night. As to mother, the petition alleged that she "left the father alone in care of the minors despite concerns from the CPS case in 2019 where their children were removed from his care due to neglect." A second related allegation discussed the neglect of father that led to the previous case, which included sleeping while the children were awake, leaving the children, including then infant Elias T., unsupervised.

Mother contends that, because she and father successfully completed the requirements of the 2019 case in San Bernardino County, she had no reason to be concerned about father's level of care of the children. However, mother told the agency she had never left father with Liam T. before and that he had not been around to care for the other children when they were infants. She knew father had co-slept with R.T. when she was an infant, and she knew father had been neglectful by failing to provide supervision for Elias T. as an infant. Mother failed to discuss her routine with Liam T. before leaving him with father as she expressed disagreements on child rearing practices, and she did not want to seem "overbearing." Here, there is sufficient evidence to support the court's findings.

If mother's argument is that there was no evidence showing that she posed a risk to the minors, making section 300, subdivision (f) inapplicable to her, we note that subdivision (f) makes no mention and does not require that a minor be at risk of harm for the court to take jurisdiction over the minor under this section. The statute states that the

court has jurisdiction over a minor if the court finds by a preponderance of the evidence that "[t]he child's parent or guardian caused the death of another child through abuse or neglect." (§ 300, subd. (f).) The language of section 300, subdivision (f) does not require a finding of current risk. The language of the statute contrasts with the remaining subdivisions to section 300, including subdivisions (b) and (j), which specifically contain provisions allowing a court to take jurisdiction over a minor when a minor is at risk of harm. (*Ibid.*) " 'Where a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted.' " (*In re Connie M.* (1986) 176 Cal.App.3d 1225, 1240.) Thus, we conclude the court did not need to make findings that mother posed a risk to the children under the language of section 300, subdivision (f). There is sufficient evidence to support the court's jurisdictional findings under this subdivision.

And while we need not address additional subdivision allegations further, we note that the "risk of harm" required under subdivisions (b) and (j) is certainly present here. Mother consistently denied any part in the death of Liam T., refusing to acknowledge her own actions in leaving him with father despite previous issues with his lack of supervision of the children leading to the previous dependency and his lack of having been left with Liam T. before and without instruction.

## II. DISPOSITIONAL FINDINGS

Mother also contends that there is insufficient evidence to support the disposition findings of detriment to deny physical custody as to her. We affirm.

"After finding that a child is a person described in Section 300, the court shall hear evidence on the question of the proper disposition to be made of the child." (§ 358, subd. (a).) In order to remove a child from parental custody, the juvenile court must find by clear and convincing evidence there is or would be a substantial danger to the child's physical or emotional well-being if the child were returned home and there are no

14.

reasonable means by which the child's physical health can be protected short of removal. (§ 361, subd. (c).)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.) "In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous, and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170.)

On a challenge to the juvenile court's dispositional order, we review the finding to determine whether substantial evidence supports it. We do so bearing in mind that the juvenile court's decision to order a child removed from parental custody must be supported by the heightened standard of clear and convincing evidence. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

At the time of the disposition hearing, mother claimed she had separated from father, which she now contends would mean they would be safe in her care. Although not argued at disposition, she now contends she had a plan to live with maternal grandmother where the children were currently placed. However, the evidence in the record was that the caregivers were not amenable to this arrangement, and, at the time of disposition, mother was renting at her boss's house in a different county and she could not have the children there.

Furthermore, mother's issues throughout the case were that she continued to deny any responsibility for the situation that led to Liam T.'s death, and she was dishonest and manipulative, both with the agency and the caregivers. Mother gave conflicting stories as to when, or even if, she and father had separated and whether she had left Liam T. at risk the night before. She told the social worker she had not asked father what had happened the night of Liam T's death because she did not want to know. The agency expressed concern that not knowing would prevent mother from being able to protect her children. Mother also failed to talk to father about his marijuana use but seemed to assume that he only used when she was home to watch the children.

Mother's attitude throughout the proceedings was that it was father's problem and she did not take any responsibility for the situation. Mother incorrectly believed that leaving father would mean the children were automatically returned to her. Realizing that that was not so, mother then said she left father "for no reason." Mother's only concern with father was that he had not started services.

Mother's refusal to accept any responsibility in Liam T.'s death, her on and off relationship with father, her lack of honesty and manipulation of both social workers and maternal grandmother and her partner all support the juvenile court's finding of a substantial risk of detriment if the children were not removed from mother's care. We reject mother's claim to the contrary.

**DISPOSITION**

The orders of the juvenile court are affirmed.

FRANSON, J.

WE CONCUR:


LEVY, Acting P.J.


PEÑA, J.